**UNITED STATES of America**

v.

**John T. ROBINSON, Appellant.**

**No. 82–1247.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 17, 1982.

Decided Jan. 4, 1983.

William J. Garber, Washington, D.C. (appointed by this court), for appellant.

Richard H. Gordin, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell and Joseph F. McSorley, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WRIGHT, MIKVA, and EDWARDS, Circuit Judges.

Opinion for the court PER CURIAM.

Concurring statement filed by Circuit Judge MIKVA.

1. 18 U.S.C. §§ 2314 & 2315 (1976).

PER CURIAM:

Appellant John T. Robinson seeks reversal of his conviction for interstate transportation and sale of stolen property,[1] challenging the legality of the government's electronic surveillance and police investigative procedures. For the reasons detailed below, we reject each of appellant's grounds for reversal. However, we take this opportunity to remind the government once again that both Congress and the Supreme Court require strict compliance with the letter of the statutes controlling the use of electronic surveillance devices.

## I. BACKGROUND

On February 19, 1981 District Judge Norma Holloway Johnson approved the installation of an electronic listening device inside the "Royal Carpet," a second-hand business in the District of Columbia. The owner, Joseph Martin, was suspected of operating as a "fence" for stolen property and was the subject of a joint investigation by the Federal Bureau of Investigation (FBI) and the D.C. Metropolitan Police Department. The application for the listening device was authorized by Assistant Attorney General Sanford M. Litvack pursuant to 18 U.S.C. § 2516(1) (1976 & Supp. V 1981), and by the United States Attorney for the District of Columbia, Charles F.C. Ruff, pursuant to 23 D.C.Code § 546 (1981).

On January 19, 1981 Assistant Attorney General Litvack had been specially designated to authorize such applications by Attorney General Benjamin R. Civiletti under 18 U.S.C. § 2516(1) (1976 & Supp. V 1981). On January 22, 1981 William French Smith became the new Attorney General. Assistant Attorney General Litvack's special designation was revalidated by Attorney General Smith on February 27.

On March 21 FBI agents observed appellant Robinson entering the Royal Carpet, then under both visual and electronic surveillance. Agents at the listening post

overheard a conversation between appellant and store owner Martin during which Martin purchased some jewelry from Robinson and advised him to hide the cash payment in his socks. The agents radioed to FBI Agent Christopher Kerr, then parked several blocks from the store, and warned him that Robinson was about to leave the Royal Carpet. Kerr stopped Robinson as he departed and began questioning him. Meanwhile, other agents searched the store and found the just-sold jewelry in the lining of Martin's coat. Kerr searched appellant and found $250 in his socks. To avoid disclosing the existence of the surveillance operation, Kerr did not arrest Robinson, but simply asked him to come by the FBI field office that afternoon. Robinson never kept the appointment. Police later identified the jewelry recovered from Martin's coat as the property of an Arlington family whose home had recently been burglarized.

The listening device remained in operation until 5:28 p.m. on March 21. The 56 reels of tape were not ordered sealed by Judge Johnson until March 25.

Later that week, on March 26, Kerr and other FBI agents went to a house at 600 Keefer Place, N.W. with an arrest warrant for a Howard Parker. Although the owner of the house protested that Parker was not there, the agents nevertheless entered and began a room-by-room search of the premises. In a back room Kerr found Robinson lying face-down on a bed with an embossed stamp album near his outstretched hand on the floor. Kerr recognized Robinson from their March 21 encounter and recognized the stamp album as part of the property stolen in the Arlington robbery. Kerr escorted Robinson outside. Robinson agreed to go to the FBI office but only if Kerr would handcuff him until they were out of visual range of the house so as to avoid looking like a "snitch." At the field office, after receiving his *Miranda*[2] rights, Robinson confessed to the Virginia burglary. Only then was Robinson formally arrested.

On May 19, 1981 a grand jury indicted Robinson for interstate transportation of stolen property, 18 U.S.C. § 2314 (1976), and for sale of stolen goods, 18 U.S.C. § 2315 (1976). Appellant Robinson subsequently made two motions to suppress evidence before Judge John H. Pratt. In the first motion, submitted on briefs alone, appellant argued to suppress all evidence obtained as a result of the listening device because several of the statutory procedural requirements had not been met by the law enforcement officials. In the second motion appellant argued at a hearing that because the arrest at 600 Keefer Place was illegal and the subsequent confession involuntary, his incriminating statement should be suppressed. Judge Pratt denied both motions.

On January 6, 1982 a stipulated, non-jury trial was held. Robinson was found guilty and was sentenced to three years on each count, the terms to be served concurrently. This appeal was noted on March 8, 1982.

## II. ANALYSIS

Appellant presents four challenges to his conviction: (1) that the government failed to follow the statutorily-required electronic surveillance procedures; (2) that the March 26 arrest violated his Fourth Amendment rights; (3) that his confession was involuntary; and (4) that the government failed to prove an essential element of interstate transportation of stolen goods. We address these arguments in order below.

### A. *Electronic Surveillance Procedures*

#### 1. *Standards for suppression*

Appellant's contention is that the government failed to follow several statutory requirements for obtaining and using the electronic listening device. He argues that these failures to follow proper procedures necessitate suppression of all electronically obtained evidence since the communications were "unlawfully intercepted" within the meaning of both 18 U.S.C. § 2518(10)(a)(i)

---

**2.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(1976 & Supp. V 1981)[3] and 23 D.C.Code § 551(b)(1) (1981).[4] To evaluate these arguments, we must first set forth the standards governing suppression.[5]

The Supreme Court has made clear that not "every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *United States v. Chavez*, 416 U.S. 562, 574–575, 94 S.Ct. 1849, 1855–1856, 40 L.Ed.2d 380 (1974). The suppression remedy would be warranted only when the government "fail[s] to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Donovan*, 429 U.S. 413, 433–434, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977) (*quoting United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974)).

This court has recently addressed itself to these Supreme Court opinions in *United States v. Johnson*, 696 F.2d 115 (D.C.Cir. 1982). We held that in evaluating the need for suppression of electronically obtained evidence, we shall be guided by the principle implicit in the above opinions—"that violations of even these central [statutory] requirements do not mandate suppression if the Government demonstrates to the court's satisfaction that the statutory purpose has been achieved despite the violation." 696 F.2d at 121 (footnote omitted). We will therefore focus on these considerations in evaluating appellant's claims that the conversations in the Royal Carpet were "unlawfully intercepted" and that all evidence derived therefrom must be suppressed.

## 2. *Authorization of application*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1976 & Supp. V 1981) prescribes the procedures for obtaining the necessary judicial approval of electronic surveillance. The statute provides in pertinent part:

> The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for * * * an order authorizing or approving the interception of wire or oral communications * * *[.][6]

Assistant Attorney General Litvack had been "specially designated" on January 19, 1981 by Attorney General Civiletti. Mr. Litvack authorized the application in this case on February 19, 1981. However, on

---

**3.** The federal statute, 18 U.S.C. § 2515 (1976), expressly prohibits the use of actual contents of any intercepted communication or any evidence derived therefrom "if the disclosure of that information would be in violation of this chapter." Under § 2518(10)(a), such violations would result if:

> (i) the communication was unlawfully intercepted;
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
> (iii) the interception was not made in conformity with the order of authorization or approval.

On the facts of this case, only § 2518(10)(a)(i) is relevant.

**4.** 23 D.C.Code § 551(b) (1981) mandates suppression of wire or oral communications intercepted pursuant to the D.C.Code and evidence derived therefrom if:

> (1) the communication was unlawfully intercepted;

> (2) the order of authorization or approval under which it was intercepted is insufficient on its face;
> (3) the interception was not made in conformity with the order of authorization or approval;
> (4) service was not made as provided in section 23–547; or
> (5) the seal prescribed by section 23–549(a) is not present and there is no satisfactory explanation for its absence.

**5.** We have recently held that the phrase "unlawfully intercepted" has the same meaning in both the federal and the local statutory schemes. *See United States v. Johnson*, 696 F.2d 115, 120–121 (D.C.Cir.1982). Therefore, the same standards for suppression govern challenges under either the federal or the D.C. statutes.

**6.** 18 U.S.C. § 2516(1) (1976 & Supp. V 1981).

January 22 Attorney General Civiletti had been succeeded by William French Smith. The issue before the court is whether the special designation of Mr. Litvack by Attorney General Civiletti satisfies the requirements of 18 U.S.C. § 2516(1) for an electronic surveillance application that was made only after Mr. Civiletti had left office.

The government argues that the statutory requirement was satisfied by the January 19, 1981 special designation and that no new designation was required.[7] For support, the government relies on the general proposition that orders and decisions of one Attorney General must continue in effect until changed by a successor to the office; to require express revalidation of *all* grants of authority would throw into chaos the ongoing operations of the Department of Justice. *See, e.g., In re Weir,* 520 F.2d 662, 667 (9th Cir.1975) (authorization of grant of immunity continues under successor); *United States v. Morton Salt Co.,* 216 F.Supp. 250, 256 (D.Minn.1962) (authority of Justice Department attorneys to appear before grand jury continues), *aff'd,* 382 U.S. 44, 86 S.Ct. 181, 15 L.Ed.2d 36 (1963).

However, arguments about the need for administrative continuity miss the mark in this case. The power to authorize electronic surveillance applications is uniquely circumscribed by statute. Congress has identified a very limited category of officials who may legally wield this power. Section 2516's restrictions thereby ensure that decisionmaking is "centralize[d] in a publicly responsible official subject to the political process." S.Rep. No. 1097, 90th Cong., 2d Sess. 97 (1968). Furthermore, should abuses occur, the statute guarantees that "the lines

of responsibility lead to an identifiable person." *Id.*

■ There is no doubt that Section 2516 is one of those central safeguards in the statute which, if violated, warrants suppression.[8] However, despite appellant's arguments to the contrary, the authorization by Assistant Attorney General Litvack adequately satisfies the purposes of the statutory provision. Mr. Litvack had been specially designated by Attorney General Civiletti within the literal meaning of Section 2516(1). He was a clearly identifiable and politically accountable person within the Justice Department.[9]

Still, the court is concerned about the lack of diligence and forethought that characterize the actions of the Justice Department in this case. Questions about the legality of relying on outdated special designations have arisen before[10] and should have encouraged this Administration to revalidate special designations more promptly. However, since the delay in revalidation was relatively brief and since the purposes of the statutory requirements were adequately served, we will not overturn the District Court's denial of appellant's motion to suppress.

### 3. *Inadequacy of the affidavit*

Appellant also argues that the affidavit supporting the government's application for the listening device failed to provide the required "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" 18 U.S.C. § 2518(1)(c) (1976 & Supp. V

---

7. On February 27, however, Attorney General Smith did renew Mr. Litvack's special designation.

8. *See United States v. Johnson, supra* note 5, 696 F.2d at 122. *See also United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974) (stressing Congress' clear intent to constrain the use of intercept authority by this and other preconditions).

9. Appellant asserts that Mr. Litvack cannot be considered responsive to the political process since he was part of an administration already voted out of office. This argument proves too much; carried to its logical conclusion, the argument would imply that *no* lame-duck administration official could authorize electronic surveillance.

10. *United States v. Wyder,* 674 F.2d 224 (4th Cir.1982) (finding no basis for suppression).

1981).[11] This requirement ensures that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).

We find the application more than adequate to fulfill the statutory requirement. While appellant terms the affidavit conclusory, in fact it is remarkably detailed. It provides a thorough explanation of the need for the listening device—the need to determine the scope of the illegal fencing operation, the identities of the parties, the methods of operation, the possibility of police involvement, and, perhaps most critically, the need to gather evidence to prove "knowledge" on the part of Martin and his co-conspirators. It is clear that fences are more difficult to prosecute because superficially they do run legitimate businesses and can merely assert their lack of knowledge as to whether the goods they bought were in fact stolen. And yet we must be careful not to permit the government merely to characterize a case as a "drug conspiracy" or a "fencing conspiracy" that is therefore inherently difficult to investigate. The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail. *See United States v. Johnson, supra,* 696 F.2d at 124; *United States v. Williams,* 580 F.2d 578, 588 (D.C.Cir.), *cert. denied,* 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978). The government here provided detailed information about two confidential sources that were reluctant to testify, the various means that had already been tried (including pen registers, seizures of trash, and undercover operations), and why these techniques failed to provide adequate evidence. In our judgment, the government has clearly carried its burden of showing that the listening device was necessary as other procedures, while somewhat successful, had been inadequate.

### 4. Judicial sealing of the tapes

Appellant also argues that the evidence obtained from the listening device should be suppressed because the government did not provide a "satisfactory explanation" for the delay of four days in arranging for judicial sealing under the requirements of 18 U.S.C. § 2518(8)(a) (1976 & Supp. V 1981) and 23 D.C.Code § 549(a) (1981).[12] We find this argument similarly unpersuasive. In *United States v. Johnson, supra,* 696 F.2d at 125, we held that "in most cases, evidence from which the court can infer that the tapes were held in such a condition as to ensure that they could not be tampered with will be an important component of the Government's 'satisfactory explanation.' "

Here, the record indicates that the government's explanation for the four-day delay is barely sufficient. The delay was attributed to: (1) the need to duplicate the tapes before sealing in order to provide a working copy for the prosecutor; and (2) the simultaneous, time-consuming efforts of the prosecutor and case agents to prepare another application for a wire intercept to replace the expired oral intercept at the Royal Carpet. Given the brevity of the delay, we are inclined to accept this explanation as sufficient. It should be clear, however, that *any* delay is not in keeping with the required strict adherence to the statute and that this court's toleration of such deficiencies has its limits.

### B. The Illegal Search and Arrest

The question whether appellant had a sufficiently "reasonable expectation of privacy" in the 600 Keefer Place home to

---

11. Appellant also challenges the affidavit for noncompliance with 23 D.C.Code § 547(c)(3) (1981) which similarly requires a showing that "normal investigative procedures have or would have been tried and have or had failed or reasonably appear or appeared to be unlikely to succeed if tried or to be too dangerous."

12. 23 D.C.Code § 551(b)(5) (1981) explicitly makes the absence of a seal without satisfactory explanation a ground for suppression. A delay in sealing must also be explained satisfactorily to avoid suppression. *United States v. Johnson, supra* note 5, 696 F.2d at 124; *United States v. Gigante,* 538 F.2d 502, 507 (2d Cir.1976).

challenge the legality of the police search of the premises and his own arrest [13] is more troublesome. On March 26th the police went to 600 Keefer Place with an arrest warrant for Harold Parker. The owner of the home came to the door, asserted that Parker was not there, and refused to allow the police to enter. Nevertheless, the police went in and conducted a room-by-room search; they failed to find Parker but, coming upon appellant, they eventually arrested him.

■ In *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Supreme Court held that a police officer may not legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant. From the perspective of the owner of the home at Keefer Place, the search was therefore illegal. However, since Fourth Amendment rights are *personal* rights, the exclusionary rule will protect only those parties whose "reasonable expectations of privacy" have been violated. *See United States v. Salvucci,* 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–2553, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). Therefore, the relevant inquiry is whether Robinson's Fourth Amendment rights were violated by the search—did *he* have a reasonable expectation of privacy at Keefer Place? *Steagald* explicitly left open the question whether someone like Robinson could object to an unlawful search of a third party's home on the ground that, as an invited guest, his expectation of privacy against police intrusions should be as great as that of the host himself.

We believe that a person can have a legally sufficient interest in a place other than his home to warrant Fourth Amendment protection from unreasonable government intrusion. The question remains how to define that interest. The Fifth Circuit has enumerated the factors that ought to be considered in ascertaining the existence of a reasonable expectation of privacy:

> whether the defendant has a [property or] possessory interest in the thing seized or the place searched, whether he has the right to exclude others from the place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises. * * *

*United States v. Haydel,* 649 F.2d 1152, 1155 (5th Cir.1981). Recently, the Fifth Circuit applied this test to a situation somewhat analogous to appellant's case. It found that an illegal alien who resides in a house used as a "way station" for smuggling Mexicans into the United States has no reasonable expectation of privacy, and thus a warrantless search of that house did not violate his Fourth Amendment rights. *United States v. Briones-Garza,* 680 F.2d 417 (5th Cir.1982).

■ Since appellant has not offered facts to establish a "reasonable expectation of privacy" under these factors, we have no basis for finding one. We find in the record the fact that Robinson was "a guest on those premises" (Transcript of Nov. 13th Hearing at 90); the police assertions that the place was "chaotic" and was being used by seven or eight people (*id.* at 42–44); and the fact that Robinson was found in a room with another person (*id.* at 45). This evidence that people freely came and went from the premises certainly cuts against normal expectations of privacy and supports the District Court's findings of fact and law. However, we take this opportunity to note that the record is disturbingly incomplete. Appellant's counsel introduced no evidence on how long Robinson had been in the house, whether he was in fact living

---

**13.** We assume that appellant's "seizure" and the subsequent "request" to come to the field office for interrogation would constitute an "arrest" for purposes of the Fourth Amendment. *See Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). We decline to consider appellant's arguments about the March 21st arrest outside of the Royal Carpet. First, that was not an issue preserved for appeal at the trial, and second, the police had adequate probable cause to effect a warrantless arrest in the public place of the streets under *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

there, if he had a key, or the nature of his relation to the owner. Yet, on the basis of the record before us, we must find that appellant had no expectation of privacy in the Keefer Place home and therefore cannot challenge either the search of the premises or his arrest therein.

### C. Voluntariness of Appellant's Statement

■ Robinson argues that his confession made at the FBI field office was "involuntary." He claims that the statement was somehow elicited by the government's promises to inform the prosecutor of his cooperation and not to arrest and charge him that very day. Under *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973), the court must look to see if the confession is "the product of an essentially free and unconstrained choice by its maker." The confession may not be "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (brackets in original), *quoting Bram v. United States,* 168 U.S. 532, 542–543, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897). This determination must be reached in light of the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 226, 93 S.Ct. at 2047.

■ Robinson's statement is clearly voluntary under this test. Looking at the factors established by this circuit in *Pettyjohn v. United States,* 419 F.2d 651 (D.C. Cir.), *cert. denied,* 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970), appellant was 30 years old, possessed an eleventh-grade education, and had been convicted twice before of serious felonies. He had the maturity, education, and experience with the police to understand the waiver of his *Miranda* rights. Appellant can point to no threats or any use of force that might render his statement involuntary. Instead, he claims only that two "promises" were made to him. The first promise was that his

cooperation "would be made known" to the prosecutor. This promise alone is not sufficient to "overbear his free will" under *Schneckloth. See United States v. Fera,* 616 F.2d 590, 594 (1st Cir.1980); *see also United States v. Pomares,* 499 F.2d 1220, 1222 (2d Cir.) (*en banc*), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974) (even with additional promise that appellant would be let out on bail, confession still held to be voluntary). In fact, even when a confession is made subsequent to a plea bargain, the confession will not be deemed involuntary on that account. *Hutto v. Ross, supra.*

■ Appellant also asserts that he was led to believe that he would not be arrested and charged that very day. FBI Agent Kerr has admitted that such was his intent, but that a superior officer overruled his decision and instructed Kerr to place appellant under arrest. Appellant argues that this "promise" was important to him because it provided him with a "period of time to straighten out his personal affairs." (Transcript of Nov. 13th Hearing at 84.) However, it would be extraordinary to say that this promise was sufficiently critical to "overbear his will." At most, Kerr promised a *delay* of the arrest. The trial judge had no problem in determining that the confession was voluntary despite these two promises. While this court must make an independent determination on the issue of voluntariness, *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), we affirm the District Court on this issue.

### D. Value of the Stolen Goods

Appellant's final argument is that the government failed to prove an essential element for conviction under 18 U.S.C. §§ 2314 and 2315—namely that the stolen property had a value greater than $5,000. The government initially offered only Mrs. Ryan's testimony as to the value of her stolen property. Subsequently, when questions were raised as to the sufficiency of that evidence, the trial court at first found it to be sufficient, and would not allow the prosecutor to submit more evidence. The judge then reversed himself and allowed a

jeweler's written appraisal to be introduced into the record. Appellant claims that Mrs. Ryan's testimony alone was insufficient and that the later appraisal could not be considered since it had been introduced at the sentencing hearing after the verdict had been rendered.

We find no basis to reverse the trial court on the issue of value. First, the Memorandum of Agreement for the Stipulated Non-Jury Trial [14] and the colloquy at the bench trial[15] clearly indicate that both parties as well as the judge assumed that the prosecutor would be able to supplement the record if the court had any questions. Second, the reopening of even jury trials is "undoubtedly within the discretion of the trial court," limited only by an appellate court's later finding that defendant's rights were prejudiced in some way. *Morgan v. United States,* 294 F.2d 911, 913 (D.C.Cir. 1961); *see United States v. Webb,* 533 F.2d 391, 395 (8th Cir.1976). Third, the trial court could reasonably have found that the testimony of Mrs. Ryan alone was sufficient. She testified that her stolen property was worth at least $12,000 and that one of the rings had been appraised in 1961 for a value of $3,000. While courts will not permit testimony on the mere subjective value to the individual of the property, the owner's testimony on the objective, market value of the property *is* relevant. *United States v. Nall,* 437 F.2d 1177, 1187 (5th Cir.1971). Finally, the appraisal itself does clearly establish that the jewelry found at the Royal Carpet alone was worth over $6,000. *See United States v. Evans,* 614 F.2d 1195 (8th Cir.1980) (jeweler's appraisal is more than adequate proof of value). In short, while the evidence was neither introduced nor considered in an orderly fashion, the District Court could reasonably have inferred that the stolen property had a value greater than $5,000.

### III CONCLUSION

For the above reasons, the judgment of the District Court is

*Affirmed.*

14. *See* Record, Doc. No. 20.

MIKVA, Circuit Judge, concurring:

I adhere to my view, as stated in *United States v. Johnson,* 696 F.2d 115 (D.C.Cir. 1982) (Mikva, J., dissenting in part), that violations of the plain language of a central provision in a wiretapping statute require suppression of the tainted evidence. In this case, however, the wiretap application was properly authorized by Assistant Attorney General Litvack, who had been specially designated under 18 U.S.C. § 2516(1) (1976 & Supp. V 1981). Because the statutory requirements have been satisfied, I agree with the majority that the lack of diligence demonstrated by the Department of Justice in renewing Mr. Litvack's special designation does not require suppression in this particular case.