UNITED STATES of America,
Plaintiff-Appellee,

v.

Barbara Brooks CAMP,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

George Evans HARP,
Defendant-Appellant.

Nos. 83–5048, 83–5049.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 9, 1983.

Decided April 26, 1984.

D. Blair Watson, Los Angeles, Cal., for plaintiff-appellee.

Robert M. Talcott, Talcott, Vandevelde, Woehrle, W. Michael Mayock, Los Angeles, Cal., for defendant-appellant.

Before HUG and REINHARDT, Circuit Judges, and PANNER,* District Judge.

PANNER, District Judge:

After a bench trial on stipulated facts, Barbara Brooks Camp ("Camp") and George Evans Harp ("Harp") were convicted of conspiracy to distribute heroin and use of a telephone to facilitate that conspiracy. Additionally, Camp was convicted of possession of heroin with intent to distribute.

In this consolidated appeal, both appellants argue the district court erred when it denied their motions to suppress evidence obtained through interception of wire communications. They contend the wiretap application was not authorized by an Assistant Attorney General "specially designated" in accordance with 18 U.S.C.A. § 2516(1) (1983). They argue that the communications therefore were not lawfully intercepted within the meaning of 18 U.S.C.A. § 2518(10)(a) (1983). They also contend the affidavit filed in support of the initial wiretap application failed to establish probable cause. We REMAND in light of

subsequent evidence first revealed on appeal.

## I

On November 2, 1982, law enforcement officials obtained an order from the Honorable Malcolm M. Lucas authorizing the interception of wire communications over two telephones in the Los Angeles area. Attached to the November 2, 1982, application was an order dated January 19, 1981, signed by Attorney General Benjamin R. Civiletti. In that order, Civiletti designated "the Assistant Attorney General in charge of the Criminal Division" and three other Assistant Attorneys General as empowered to authorize applications for wiretap orders. Also attached to the application was a memorandum dated November 1, 1982, signed by D. Lowell Jensen, Assistant Attorney General, Criminal Division, communicating his approval of the wiretap application.

On November 15, 1982, FBI agents intercepted two telephone conversations between Camp and Harp. Both calls concerned the mailing of a package to Harp who was residing in Metter, Georgia. On November 16, Camp mailed an envelope to "Barbara Ann Harp" in Metter. Two days later, FBI agents executed a search warrant on the envelope. They found $1,000 in cash and 12.2 grams of heroin.

On December 8, 1982, the Honorable David V. Kenyon extended the wiretap authorization. Subsequently a search warrant was executed on Camp's residence. Numerous plastic bags containing 191.2 grams of heroin were found in an open safe.

On December 22, 1982, an indictment was filed in the Central District of California. On February 10, 1983, the Honorable Manuel Real denied defendants' motions to suppress and, based on stipulated facts, convicted Camp and Harp on all charges except attempting to distribute heroin. A timely appeal was noticed on March 3.

## II

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 211–25, 18 U.S.C.A. §§ 2510–2520 (1983), prescribes the procedure for securing judicial authority to intercept wire communications in certain criminal investigations. Section 2516(1) confers power on the "Attorney General, or any Assistant Attorney General *specially designated* by the Attorney General" to "authorize an application to a Federal judge ... for ... an order authorizing or approving the interception of wire or oral communications" by federal investigative agencies seeking evidence of specified serious offenses. 18 U.S.C.A. § 2516(1) (1983) (emphasis added).

The Supreme Court has held that this statute does not empower the Executive Assistant to the Attorney General to authorize wiretap applications, even where the Attorney General has specifically wanted him to do so. *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). The Ninth Circuit reached the same conclusion earlier. *United States v. King,* 478 F.2d 494 (9th Cir.1973), *cert. denied,* 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

The Supreme Court reasoned:

> Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced a clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications .... The mature judgment of a particular responsible Department of Justice official is interposed as a critical precondition to any judicial order.

*Giordano,* 416 U.S. at 515–16, 95 S.Ct. at 1826–27.

The Court quoted applicable legislative history:

> Paragraph (1) [*i.e.* § 2516(1)] ... centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen.

*Id.* at 520, 94 S.Ct. at 1829 (quoting Senate Report No. 1097, 90th Cong., 2nd Sess.

96–97 (1968)). The Court commented that the Senate Report

> not only recognizes that the authority to apply for court orders is to be narrowly confined but also declares that it is to be limited to those responsive to the political process, a category to which the Executive Assistant to the Attorney General obviously does not belong.

*Id.*

As this case came to us originally, it posed the following situation. On his last day in office, Attorney General Civiletti under President Carter signed an order "specially designating" several Assistant Attorneys General, by job title rather than name, to authorize applications for wiretap orders. The Presidential administrations changed. In reliance on the previous designation, Assistant Attorney General Jensen appointed by newly elected President Reagan authorized a wiretap application. The question we faced was whether principles of administrative continuity validated the new Assistant Attorney General's decision.

The Fourth Circuit has held that these principles would uphold wiretap authorizations where there has been a change of Attorneys General within one Presidential administration. *United States v. Wyder,* 674 F.2d 224 (4th Cir.1982), *aff'g, United States v. Mallory,* 507 F.Supp. 99 (D.Md. 1981), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982). In *Wyder,* Attorney General Griffin Bell, on August 15, 1978, had designated the Assistant Attorneys General in charge of the Criminal Division, Tax Division and Office of Legal Counsel as officials empowered to authorize wiretap applications. In August, 1979, Benjamin R. Civiletti succeeded Griffin Bell as Attorney General. No new section 2516(1) order was issued, nor was the 1978 order revoked. The wiretap application at issue had been approved by Philip Heymann, Assistant Attorney General in charge of the Criminal Division, in April, 1980. 674 F.2d at 226. The *Wyder* court concluded that section 2516(1) does not represent a deviation from the usual rule that administrative orders ordinarily remain in effect beyond the tenure of the individual who issued them. *Id.* at 227.

Recently, the District of Columbia Circuit upheld a district court's decision not to suppress evidence obtained from a wiretap while spurning this administrative continuity argument. *United States v. Robinson,* 698 F.2d 448 (D.C.Cir.1983). A review of that decision reveals that Assistant Attorney General Sanford M. Litvack had been designated to authorize wiretap applications, by job title rather than name. The authorization was by Attorney General Civiletti on January 19, 1981. On January 22, 1981, William French Smith became the new Attorney General. He revalidated Litvack's special designation on February 27, 1981. The issue before the court was whether Civiletti's special designation of Litvack satisfied the requirements of section 2516(1) for a surveillance application made only after Civiletti had left office, and before the revalidation by Smith. The court concluded there was no violation of the statute. Civiletti had specially designated Litvack "within the literal meaning of Section 2516(1)." *Id.* at 452. However, the court added a paragraph strongly criticizing the Justice Department for delaying issuance of the revalidation order. It then concluded that it would not order a reversal "since the delay ... was relatively brief and ... the statutory purposes ... adequately served." *Id.*

At oral argument, we asked the Government's attorney whether Attorney General Smith's February 27, 1981, order referred to in *Robinson* was a general revalidation of specially designated Assistant Attorneys General by title rather than just a revalidation of Litvack specifically. Counsel insisted the District of Columbia Circuit did not have that order before it, even though it was apparent from the opinion that it did.

Nearly a month after oral argument, counsel supplied us with a copy of the February 27, 1981, order. Order No. 934–81 provides in section 2, "Attorney General Order No. 931–81 remains in effect." Order No. 931–81 is Attorney General Civiletti's January 19, 1981, order. Thus, Attorney General Smith specially designated the Assistant Attorney General in charge of the Criminal Division, among others, to authorize wiretap applications. Such designation occurred long before application in this case. D. Lowell Jensen occupied that office, under Smith, on November 2, 1982.

The belated submission of the February 27, 1981, order casts an entirely new light

on the issue presented.[**] Considerations of administrative continuity are no longer relevant. The only issue is whether an Attorney General complies with section 2516(1) when he "specially designates" an Assistant Attorney General by job title rather than name.

Several courts have considered the matter and all have answered the question in the affirmative. In *United States v. Pellicci*, 504 F.2d 1106 (1st Cir.1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975), the First Circuit held that "the designation of a single person accomplished by job title rather than name does not run afoul of the legislative intent ... that the authority to approve applications be both narrowly confined and limited to those responsive to the political process." 504 F.2d at 1107. *Accord, United States v. Mallory, supra*, 507 F.Supp. at 102–03; *United States v. Votteller*, 544 F.2d 1355, 1358 (6th Cir.1976). *Cf. Giordano*, 416 U.S. at 514, 94 S.Ct. at 1826; *King*, 478 F.2d at 504 (emphasizing wiretap application authorization is personal duty to be performed by Attorney General or *any* designated *Assistant Attorney General*).

■ Just as Smith did, each Attorney General must decide which of the nine Assistant Attorneys General to empower to authorize wiretap applications. We conclude the Attorney General's choice may be reflected in designations by job title rather than name.

As the *Wyder* court suggested, the foundation of political accountability of Assistant Attorneys General is not their "special designation" *per se*. "Indeed, if delegation from the Attorney General is the touchstone of political accountability, *Giordano* may well have been decided differently." 674 F.2d at 227. Rather, the accountability of such officials lies in their appointment by the President with the advice and consent of the Senate. *Id.*

Here, an Assistant Attorney General appointed by the President and confirmed by the Senate approved the wiretap application. There is no violation of the Congressional policy as interpreted by *Giordano*. The district court's denial of the motions to suppress was correct.

We cannot let this decision pass without commenting upon the Government's extremely tardy production of the February 27, 1981 order. This case was handled by the Department of Justice's Los Angeles Strike Force rather than the United States Attorney's Office. Whether a separate Strike Force legal unit should handle cases is certainly not our concern. However, the Government should be aware that in this case the unit was unable to present the controlling fact on the wiretap authorization issue until virtually cajoled into doing

---

[**] Federal Rule of Evidence 201(f) provides that "[j]udicial notice may be taken at any stage of the proceeding." Under Rule 201(f), an appellate court can properly take judicial notice of any matter which the trial court could have so noticed, if the opposing party is given an opportunity to be heard, upon timely request, pursuant to Rule 201(e). 10 MOORE'S FEDERAL PRACTICE ¶ 201.60 at II–43 (1982). On October 5, 1983, defendants submitted their opposition to the proffered document.

The order is a public record, verifiable with certainty, and of the same type as other governmental documents which courts have judicially noticed. *See, e.g., Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 742 n. 4, 96 S.Ct. 2337, 2343, 49 L.Ed.2d 179 (1976) (state regulations implementing public aid statute); *Interstate Natural Gas Co. v. Southern Calif. Gas Co.*, 209 F.2d 380, 385 (9th Cir.1953) (Federal Power Commission report); *City of Wilcox v. F.P.C.*, 567 F.2d 394, 426 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978) (Federal Power Commission order); *Dispatch, Inc. v. City of Erie*, 364 F.2d 539, 541 (3rd Cir.1966) (Federal Communications Commission bulletin); *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 253 n. 1 (2d Cir. 1962), *cert. denied*, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962) (United States patent judicially noticed on appeal even though not introduced in evidence and passed on by court below); *McNeil v. McDonough*, 515 F.Supp. 113, 147 (D.N.J.1980), *aff'd*, 648 F.2d 178 (3rd Cir. 1981) (Attorney General's announced policy to eliminate state-required price fixing in alcoholic beverage field); *United States v. 97.19 Acres, More or Less*, 511 F.Supp. 565, 569 (D.Md.1981) (Federal Reserve Bulletin); *Sierra Club v. Morton*, 400 F.Supp. 610, 633 (N.D.Cal.1975), *rev'd on other grounds*, 610 F.2d 581 (9th Cir.1979), *rev'd*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (letter from Secretary of War to Secretary of the Interior); *Kurio v. United States*, 429 F.Supp. 42, 53 n. 7 (S.D.Tex.1970) (Internal Revenue Service publications).

so at oral argument. Had the order been provided to the trial court, the issues on appeal could have been simplified, or avoided, from the start. The unit's failure wasted the time and resources of the judiciary, the Government, and the defendants.

### III

Attached to the November 2, 1982, application for a wiretap order was a 34-page affidavit from FBI Special Agent Robert M. Hamer. The affidavit presented information obtained from several unnamed sources. In general, it reported that the sources had identified one member of a drug distribution network as a woman by the name of "Barbara" whose telephone numbers were (213) 990–7093 and (213) 907–0944.

Specifically, "source 1" had observed a person call the first of the numbers and order a specific amount of heroin. (Affidavit, ¶ 9) "Source 2" had twice observed a person call that number and discuss the purchase of heroin, one time addressing the other party as "Barbara." (*Id.*, ¶¶ 13, 20.) In addition, source 2 had been present in "Barbara's" apartment when she delivered numerous ounces of heroin. (*Id.*, ¶ 21.) Telephone toll records of (213) 907–0944 revealed that in July, 1982, ten calls were placed to (213) 648–6048. (*Id.*, ¶ 34.) That number is subscribed to by one Browning who had offered to sell heroin to "source 5." (*Id.*, ¶ 35–36.) A pen register also revealed a call from Browning's number to (213) 907–0944.

The affidavit reports significant substantiating information. For example, the FBI learned that Barbara Brooks Camp frequented or resided at the apartment where numbers (213) 990–7093 and (213) 907–0944 have their principal or working extension locations. (*Id.*, ¶¶ 11, 12, 43–44.) Known drug traffickers had been observed entering the apartment or the building which houses the apartment. (*Id.*, ¶¶ 16, 19.) The affidavit also reports the length of time the various sources had been providing confidential information and the number of convictions resulting from the information. (*Id.*, ¶¶ 10, 14, 28, 38.)

Appellants contend the affidavit fails to satisfy the *Aguilar-Spinelli* test for evaluating probable cause for issuance of a warrant based on an informant's tip. That test separately weighed an informant's "veracity," "reliability," and "basis of knowledge." *See Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

Subsequent to appellants' briefing, the Supreme Court decided *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). There the Court abandoned the *Aguilar-Spinelli* test. In its place the Court substituted a "totality of the circumstances" approach. *Id.* at ——, 103 S.Ct. at 2332. The Court stated:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Id.* at ——, 103 S.Ct. at 2332 (quoting, *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

■ A review of Hamer's affidavit persuades us that there was probable cause to believe a wiretap of telephone numbers (213) 990–7093 and (213) 907–0944 would produce evidence of crimes specified in section 2516(1). Accordingly, the decision to deny the motions to suppress evidence was correct.

■ On rehearing, we have determined that these cases should be remanded to the district court to afford the appellants an opportunity to withdraw their stipulation of fact. Appellants entered into the stipulation as a result of mistaken information concerning the authorization of the wiretap. The information related to the actions that had or had not been taken by the Attorney General of the United States. Appellants had every reason to rely on the factual representation made in this regard

by the federal prosecutor. As the correct information was not brought to the attention of appellants until after the appeal had been heard, they are entitled to withdraw their stipulation should they choose to do so. In that event, the district court will vacate the judgments of conviction and grant appellants a trial.

These cases are REMANDED to the district court.