865 F.2d 1269
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lloyd A. WALKER, (87-5113), Kenneth A. Jackson, (87-5114),
Defendants-Appellants.
 Nos. 87-5113, 87-5114.
 United States Court of Appeals, Sixth Circuit.
 Jan. 9, 1989.
 
 Before KEITH, KENNEDY and MILBURN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Lloyd Walker appeals his convictions for conspiracy to import marijuana, importation of marijuana, and possession of marijuana with intent to distribute.[1] Defendant Kenneth Jackson appeals his conviction for possession of marijuana with intent to distribute.[2] For the reasons that follow, we affirm.
 
 I.
 
 2
 Defendants Walker and Jackson were arrested in the Louisville, Kentucky, area on March 16, 1986, and indicted by a grand jury in April 1986. After a jury trial, Walker was convicted of conspiracy to import marijuana, importation of marijuana, and possession of marijuana with intent to distribute. Jackson was convicted on one count of possession of marijuana with intent to distribute.
 
 
 3
 On January 9, 1987, Walker was sentenced to fifteen years on the conspiracy count and five years for each of the importation counts and the possession count. The five-year terms were to be served concurrently, but subsequent to the fifteen-year term. He was fined $50,000.00 on the conspiracy count and special penalty assessments of $50.00 on each of the four counts. Jackson was sentenced to five years and fined the penalty of $50.00. These appeals were filed on January 16, 1987.
 
 
 4
 The charges against the defendants were developed in an ongoing investigation by the Drug Enforcement Administration ("DEA") into the trafficking of controlled substances in Kentucky. These cases were initiated by Randall Garrett, a defendant in several other drug cases, who began cooperating with the DEA in 1985. In December 1985, Garrett informed DEA Special Agent Rick Sanders that he had been contacted by defendant Walker months before concerning the importation of marijuana. At Sanders' direction, Garrett contacted Walker to see if he was still interested. The two eventually agreed Garrett would provide an airplane and a pilot to bring marijuana from Jamaica into the United States for distribution in New York.
 
 
 5
 On or about February 13, 1986, Scott Mathias, a DEA pilot/agent acting under cover, flew commercially to Jamaica to meet Walker and others to discuss the importation of marijuana. On February 26, 1986, Mathias flew a DEA aircraft to Jamaica and landed it at a plantation airstrip in accordance with arrangements that he had made with Walker and others. However, the plane was damaged during the landing thereby reducing its carrying capacity. Two hundred forty-two and one-half pounds of marijuana were loaded into the plane, which Mathias returned to the United States. The marijuana was delivered to Agent Sanders in Louisville.
 
 
 6
 On March 11, 1986, Mathias again flew to Jamaica. Landing at the same airstrip, he was again met by Walker and others. The plane was filled with marijuana and Mathias flew it back to the United States. The weight of this second shipment was approximately 734 and 1/2 pounds, for a total weight of marijuana in the two flights of approximately 977 pounds.
 
 
 7
 On or about March 14, 1986, Walker appeared in Louisville, Kentucky, where he rented a Lincoln Town Car from Budget Rent-A-Car Company. The next day, he rented a second Town Car from Hertz, listing defendant Jackson as an alternate driver. On March 15, 1986, Walker rented a room at the Holiday Inn Rivermont Center in Louisville, attempting to use the name Trevor McKenzie. Jackson later admitted sharing the room with Walker. As part of his bargain with Walker, Garrett provided a third Town Car and a driver, undercover Detective Bryan Finney of the Kentucky State Police.
 
 
 8
 On March 16, 1986, Finney met with Walker and Jackson in their hotel room. They discussed driving routes to New York, expense money, drivers' payments, staggered departure times, and obeying speed limits to prevent detection. Finney and Jackson then drove to the loading site. Walker went to the airport, where he was arrested as he was boarding an airplane bound for New York.
 
 
 9
 Jackson assisted in packing the marijuana into three cars at the loading site. During the loading, which was videotaped by the DEA, Jackson told undercover agents that he had hauled marijuana for Walker before. Jackson was arrested at the loading site.
 
 
 10
 Immediately after his arrest, Jackson was interviewed by DEA Special Agent Raymond F. Price. The interview resulted in a written statement in which Jackson acknowledged he had been advised of his constitutional rights, that he had a high school education and one year of college, and could read and write the English language. He acknowledged knowing that the purpose of his trip to Kentucky was to deliver marijuana to New York, and that he was to have been paid for his work.
 
 
 11
 Following their convictions, defendants Walker and Jackson filed timely notices of appeal. This joint appeal presents the following issues:
 
 
 12
 (1) whether the United States used its peremptory challenges in a racially discriminatory manner; (2) whether Jackson's statement was taken in violation of his Fifth Amendment rights; (3) whether the verdict against Jackson was supported by sufficient evidence; (4) whether the prosecution's failure to disclose certain DEA reports violated either the Brady rule or the Jencks Act; and (5) whether Walker was afforded an opportunity for a meaningful cross-examination of the prosecution's rebuttal witness?
 
 II.
 A.
 
 13
 Walker and Jackson allege the government used its peremptory challenges to exclude minority jurors, thereby depriving them of their Sixth and Fourteenth Amendment rights. Both the Supreme Court and this court have recently addressed issues relating to the discriminatory use of peremptory challenges. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986); United States v. Davis, 809 F.2d 1194 (6th Cir.), cert. denied, 107 S.Ct. 3234 (1987). In Batson, the Supreme Court explained "the Constitution prohibits all forms of purposeful racial discrimination in selection of jurors." Batson, 106 S.Ct. at 1718 (footnote omitted). A "defendant [has] the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria," id. at 1717, but "a defendant has no right to a 'petit jury composed in whole or in part of the persons of his own race.' " Id. at 1716 (quoting Strauder v. West Virginia, 100 U.S. 303 (1880)).
 
 
 14
 To establish a prima facie case of racial discrimination, the defendants must show (1) "they [are] member[s] of a cognizable racial group" and (2) "that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendants' race." Id. at 1723. This prima facie test was designed to ease the burden of proof on defendants, while giving trial courts flexibility and discretion. Id. at 1723. Once the defendants make a prima facie case, the government "must articulate a neutral explanation related to the particular case to be tried." Id. at 1723. The government's explanation need not rise to the level of a challenge for cause. Id. Because acceptance of the government's explanation will depend in large part on an evaluation of its credibility, the trial court's decision regarding the plausibility of the explanation should be given "great deference" by reviewing courts. Id. at 1724 n. 21.
 
 
 15
 In this case, the defendants made a prima facie showing of discriminatory jury selection. The burden then shifted to the United States to come forward with a neutral explanation. We agree with the district court that the government met its burden.
 
 
 16
 The record indicates that following voir dire by the court, a jury panel of approximately twenty-eight persons was selected. The United States exercised three peremptory challenges to strike three black members of the venire. The remaining black sat as an alternate. The government explained its exercise of peremptory strikes as follows:
 
 
 17
 (1) James Beasley: The government struck Beasley in part because his brother and possibly other relatives were incarcerated in federal penitentiaries, and in part because Beasley's incarcerated relatives were most likely either prosecuted or defended by the Assistant United States Attorney prosecuting this case, Alexander T. Taft, Jr., and/or defense counsel, Geoffrey Morris.
 
 
 18
 The defendants contend that this explanation is not racially neutral because the government's standard was striking jurors whose relatives were incarcerated, but it did not apply that standard to a white juror whose son was incarcerated. The defendants mischaracterize the "standard" and give far too little weight to the likelihood that Beasley had strong personal feelings regarding the United States Attorney's office in the Western District of Kentucky.
 
 
 19
 (2) Joe McCutheon: The government struck McCutheon primarily because he is known to be very familiar with the personnel in the United States Attorney's office in the Western District of Kentucky, yet failed to acknowledge that during voir dire. McCutheon once worked in the federal building as a custodian or a maintenance man. He had been in the United States Attorney's office on numerous occasions, and once helped office personnel move their library and reorganize their office space. Yet he failed to acknowledge that when questioned by the court. In addition, being familiar with McCutheon's educational level and progress in the military, the government questioned his ability to comprehend what it anticipated to be a complicated defense.
 
 
 20
 The defendants argue the government set a standard of requiring jurors to have military ranks above corporal (McCutheon's rank), but then allowed two whites to sit on the jury despite their failure to rise above corporal (or the equivalent) during their military service. The defendant's exclusive focus on military rank ignores the government's concern over McCutheon's education and his lack of candor with the court.
 
 
 21
 (3) Mrs. Mills: As explained at oral argument, the district court promised Mrs. Mills when she was selected for the jury panel that she would not have to sit on the venire unless one of the parties made that necessary. When the government later exercised a peremptory challenge to strike a white woman, Mrs. Mills was called to sit on the venire. The government explained it challenged Mrs. Mills because it feared she would resent the government for causing her to be called. The government insisted its action was not motivated by race or any other of Mrs. Mills' qualifications, and we cannot say the district court abused its discretion in finding the government's explanation satisfied the Batson standard.
 
 B.
 
 22
 Immediately after his arrest, Jackson signed a statement which he now argues was not given voluntarily and should have been suppressed. We agree with the district court that Jackson knowingly and intelligently waived his constitutional rights, and his statement was admissible evidence.
 
 
 23
 "[T]he government has the burden of proving by a preponderance of evidence that [a confession] was [given] voluntar[ily]." United States v. Holmes, 632 F.2d 167, 168 (1st Cir.1980) (per curiam); see also United States v. Dodier, 630 F.2d 232, 236 (4th Cir.1980). "The voluntariness of a confession depends on whether it is a 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's 'will has been overborne and his capacity for self-determination critically impaired.' " Dodie, 630 F.2d at 235 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 285 (1973)). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141 (1986) (quoting Fare v. Michael C., 442 U.S. 702, 707 (1979)).
 
 
 24
 The record indicates Jackson might have been very uncomfortable, being arrested with close to 1000 pounds of marijuana and surrounded by law enforcement officers. But there is no evidence his will was overborne or his self-determination was critically impaired. Jackson alleges Agent Price promised to make his cooperation known to the United States Attorney, thereby helping Jackson secure his release. Agent Price testified that he said nothing about the probabilities of Jackson's obtaining an early release, but merely that he would bring Jackson's cooperation to the attention of the prosecutor. A promise that an accused's cooperation will be made known to the prosecutor does not amount to a promise of leniency sufficient to overwhelm one's free will and render a confession involuntary. United States v. Rodgers, 755 F.2d 533, 546 (7th Cir.1985), cert. denied, 473 U.S. 907 (1985); United States v. Robinson, 698 F.2d 448, 455 (D.C.Cir.1983) (per curiam).
 
 
 25
 The district court found Jackson waived his constitutional rights in an extensive pretrial hearing in which it had the opportunity to observe the demeanor of the witnesses and evaluate their credibility. See United States v. Dennis, 701 F.2d 595, 598 (6th Cir.1983). We cannot say it erred in its conclusion that Jackson's statement was voluntary.
 
 C.
 
 26
 Jackson alleges the district court erred in denying his motion for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. "It is well established that a trial judge confronted with a Rule 29 motion must consider all of the evidence in a light most favorable to the government and grant the motion when it appears to the Court that the evidence is insufficient to sustain a conviction" based upon the standard of "beyond a reasonable doubt." United States v. Adamo, 742 F.2d 927, 932 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985). Proof sufficient to support a criminal conviction is "defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson v. Virginia, 443 U.S. 307, 316 (1979). The evidence need not be so overwhelming as to exclude every reasonable theory except guilt. Adamo, 742 F.2d at 932.
 
 
 27
 The evidence produced at trial showed Jackson roomed with Walker, participated in the drivers' meeting, assisted in loading the marijuana into the cars, and Jackson told agents he had delivered marijuana for Walker before. Additionally, the jury could consider the quantity of marijuana involved--nearly 1,000 pounds--and reasonably infer that some was meant for distribution. The jury may also have reasonably inferred that between the time he arrived in Louisville and the time he went to the loading site, Jackson had ample opportunity to bail out of the enterprise. There is also the evidence, discussed above, of Jackson's statement confessing guilt.
 
 
 28
 The jury heard from and observed witnesses on both sides of this case, including Jackson, and had a full opportunity to evaluate and compare their testimony and decide on their credibility. "[A]s this court has repeatedly instructed, it is for the jury to determine what credit should be given a witness." United States v. Meyers, 646 F.2d 1142, 1146 (6th Cir.1981). A review of the record reveals a broad body of evidence to support the jury's conclusion that Jackson was guilty of every element of the offense beyond a reasonable doubt.
 
 D.
 
 29
 Walker asserts the government's failure to produce certain DEA reports violated the rule of disclosure of Brady v. Maryland, 373 U.S. 83 (1963), and/or the Jencks Act, and constituted reversible error. Walker sought all DEA reports involving "the cooperating defendant," Randall Garrett. We agree with the district court that the prosecution did not violate either Brady or the Jencks Act.
 
 
 30
 "It is well-settled that the Government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." Pennsylvania v. Ritchie, 107 S.Ct. 989, 1001 (1987). Both exculpatory evidence and impeachment evidence fall within this rule. United States v. Bagley, 473 U.S. 667, 676 (1985). Nondisclosure, however, does not amount to constitutional error unless it is also material evidence. Ritchie, 107 S.Ct. at 1001. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.
 
 
 31
 It is generally the duty of the prosecutors to determine which evidence falls under the Brady rule and to disclose it. Ritchie, 107 S.Ct. at 1003. "Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final." Ritchie, 107 S.Ct. at 1003 (footnote omitted); see also United States v. Presser, 844 F.2d 1275, 1281 (6th Cir.1988) ("the government typically is the sole judge of what evidence in its possession is subject to disclosure.").
 
 
 32
 The government contends it produced all DEA reports relevant to this case and has not duty to open all of its files to the defendants. Ritchie, 107 S.Ct. at 1003. The government began investigating Garrett in 1983, based on information that he had dealt in drugs for several years. During the investigation, Garrett decided to cooperate with the government. As an immediate result, more than thirty indictments were handed down, including one naming Walker a defendant in another case. We agree Walker does not have a right to see reports on everything Garrett has said to the government pertaining to him and to use this trial as a discovery tool for other trials. Moreover, Walker has not shown the withheld DEA reports were material.
 
 
 33
 Walker argues in the alternative that the reports are subject to disclosure under the Jencks Act, 18 U.S.C. Sec. 3500 et seq. But as Walker conceded at oral argument, the reports cannot be considered Jencks Act statements because he called Garrett as a witness, and the Act applies only to government witnesses and prospective government witnesses. 18 U.S.C. Sec. 3500(a) & (b).
 
 E.
 
 34
 Walker's final argument is that he was denied the opportunity to effectively cross-examine Phyllis Penna in violation of his right to confront her. The government called Mrs. Penna, the chief housekeeper of the Louisville Rivermont Center Holiday Inn, in direct rebuttal to Jackson's testimony that as he sat on a bed in Walker's hotel room, he saw, in the mirror, Garrett and Walker exchange money in the bathroom. Counsel for Jackson and Walker developed this testimony on direct examination.
 
 
 35
 In rebuttal, Mrs. Penna testified to the layout and furniture arrangement in Walker's room. She testified it would have been virtually impossible to see into the bathroom in the mirror from where Jackson claimed to be sitting. In addition, the government offered into evidence a chart, drawn during Mrs. Penna's testimony showing the room layout, furniture arrangement, and possible position of the parties. The government also offered into evidence the results of an experiment it conducted, in which Mrs. Penna sat on the bed where Jackson claimed to have sat, and attempted to observe someone in the bathroom in the room mirror. The results of the experiment were consistent with her testimony that it would have been virtually impossible for Jackson to have seen someone in the bathroom, as he claimed.
 
 
 36
 District courts are given great latitude in making evidentiary decisions; the proper scope of review is whether the court clearly abused its discretion in its ruling. United States v. Mahar, 801 F.2d 1477, 1495 (6th Cir.1986). In seeking a reversal based on a "surprise witness," a defendant must show surprise, prejudice, and a contemporaneous attempt to cure the problem at trial such as a motion for a continuance. United States v. Causey, 834 F.2d 1277, 1280-82 (6th Cir.1987), cert. denied, 108 S.Ct. 2019 (1988). While Walker can show surprise at the identity of Mrs. Penna, he cannot realistically argue he was surprised that the government attempted to rebut his allegations. Rebuttal can hardly be considered surprising when its purpose "is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." United States v. Papia, 560 F.2d 827, 848 (7th Cir.1977).
 
 
 37
 This is not a case involving reciprocal discovery rights or duties regarding pretrial witness identification, such as in cases involving alibi defenses. See Wardius v. Oregon, 412 U.S. 470 (1973); Causey, 834 F.2d at 1277. Absent those special circumstances, "[t]his court ... has firmly established that defense counsel is not entitled to know in advance of trial who will testify for the government." United States v. McCullah, 745 F.2d 350, 353 (6th Cir.1984). Similarly, the general rule is that notice and opportunity to be present at an experiment are not grounds for rejection of the experiment. See McCormick on Evidence Sec. 203 p. 604 n. 30 (3d ed. 1984) ("Under present practice, lack of notice and opportunity to be present are not grounds for rejection, but they may be argued on weight."). In any event, given that Mrs. Penna's testimony pertained to Garrett's credibility, we cannot say under Fed.R.Evid. 103 that the district court abused its discretion in permitting her to testify. Even assuming arguendo it was error, the error would be harmless error beyond a reasonable doubt.
 
 III.
 
 38
 Accordingly, the convictions of defendants Walker and Jackson are AFFIRMED.
 
 
 
 [1]
 Walker was charged with violation of 18 U.S.C. Sec. 2 (principals in commission of offenses against the United States) (three counts); 21 U.S.C. Sec. 841(a)(1) (possession of controlled substances with intent to distribute) (one count); 21 U.S.C. Secs. 952(a), (960) (importation of controlled substances) (two counts); and 21 U.S.C. Sec. 963 (conspiracy to import controlled substances)
 
 
 [2]
 Jackson was charged with violation of 18 U.S.C. Sec. 2 (principals in commission of offenses against the United States) (one count) and 21 U.S.C. Sec. 841(a)(1) (possession of controlled substances with intent to distribute) (one count)