UNITED STATES of America, Plaintiff,

v.

Claudius KING, et al., Defendants.

No. 96 CR 839(NG).

United States District Court,
E.D. New York.

Jan. 7, 1998.

Mary Jo White, United States Attorney, New York, NY (Catherine E. Baird, Assistant United States Attorney, of Counsel), for U.S.

Harry C. Batchelder, Jr., New York, NY, for Claudius King.

Mitchell A. Golub, New York, NY, for Kerrin Coley.

James Michael Roth, Hurwitz Stampur & Roth, New York, NY, for Alfred Jackson.

## ORDER

GERSHON, District Judge.

On November 7, 1997, the Honorable Cheryl L. Pollack, Magistrate Judge, issued a comprehensive report, which is appended, on motions to suppress and for other relief made by defendants King, Jackson, and Coley. Review under 28 USC. § 636(b)(1)(B) is de novo. *See United States v. Rosa,* 11 F.3d 315, 328 (2d Cir.1993). No objections have been filed.

I have reviewed Judge Pollack's detailed and carefully considered report and now adopt her recommendations. All defendants' motions to suppress the wiretap evidence and defendant Jackson's motion to suppress physical evidence are denied. In accordance with discussions at a pretrial conference held before me on December 19, 1997, the Government is ordered to produce any impeachment material as to witness Pierce two weeks before trial. At the same conference the Government was ordered to identify the grounds upon which it seeks to offer Rule 404(b) material. Under the current schedule, the Government must file its papers by January 9, 1998 and the defense has until January 23, 1998 to respond.

On consent of the parties and on the recommendation of Judge Pollack, defendant Coley's motion to suppress post-arrest statements is stayed pending a psychiatric evaluation.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

POLLAK, United States Magistrate Judge.

On September 16, 1996, defendants Claudius King, a/k/a "Root" ("King"), Kerrin Coley ("Coley"), Alfred Jackson, a/k/a "Vin" ("Jackson"), Zacky Rice, a/k/a "Buddha" ("Rice"), and Tony Jakes[1] were indicted on charges related to a conspiracy to distribute cocaine

---

1. Jakes pleaded guilty before Judge Gershon on February 7, 1997, and on June 11, 1997, Rice also pleaded guilty before Judge Gershon. Accordingly, Rice's motions are no longer before this Court.

base between November 1994 and January 24, 1996. Defendants King, Coley, and Jackson moved by Notices of Motions dated December 21, 1996, December 13, 1996, and January 17, 1996 respectively, for an order pursuant to Fed.R.Crim.P. 12(b)(3) and 18 U.S.C. § 2515, suppressing certain wiretap evidence obtained by the government and other relief. The motions were referred to the undersigned by the Honorable Nina Gershon, United States District Judge, to conduct a hearing and issue a report and recommendation.

## FACTUAL BACKGROUND

According to the May 8, 1997 affidavit of FBI Special Agent Thomas McNally, submitted in opposition to defendants' motions to suppress ("the May Affidavit"), the investigation into the activities of King, Coley, and the others originated as a result of an earlier investigation, which began in the spring of 1994, into a narcotics and money laundering operation run by James Piggot, a/k/a "Blue" ("Piggott") and Randy Hampton, a/k/a "Undie" ("Hampton") (hereafter, the "Piggot investigation"). During the course of the Piggott investigation, which included a wiretap authorized by the Honorable Louis Stanton, United States District Judge, Southern District of New York (the "Piggott Wire"), the government learned that Hampton, who ran a drug distribution operation in Brooklyn and Queens, regularly purchased cocaine from Piggott, who operated out of New York City and the Bronx. The government also intercepted several conversations on the Piggott Wire which indicated that individuals, identified as "Sha" and "Ro" or "RoRo," were being supplied with drugs by Hampton which were obtained from Piggot. At that time, "Sha" was believed to be Stanley Dowtin ("Dowtin"), and "Ro" or "RoRo" was believed to be King.[2] In addition to these intercepted conversations, a confidential informant, posing as a crack buyer, provided information regarding his dealings with King on November 21, 1994, and December 13, 1994, including purchases of crack cocaine from King.

Thereafter, on January 11, 1995, the confidential information introduced an undercover detective, posing as a potential buyer of crack cocaine, to King. Later, in January 1995, King provided a telephone number—(718) 345-4456 (the "Coley Telephone")[3]—which the undercover agent used on several occasions to contact King. On January 31, 1995, the undercover agent met with King and purchased two ounces of crack cocaine from King for $1,480.00. At that time, King stated that "he had to pay his supplier more." (McNally Aff., dated June 1, 1995 (the "June Aff."), ¶ 15). Following this purchase, the undercover agent spoke again to King over the Coley Telephone regarding the possible purchase of handguns. (Id. ¶ 16).

On June 1, 1995, the government obtained authorization from Judge Stanton to intercept and record the wire and oral communications of King, Jakes, Dowtin, Valerie Brooks, and others over the Coley Telephone, which was subscribed to in the name of Maureen Price, located at 230 Lott Avenue, Apartment 4F, Brooklyn, New York. This address was later identified as Coley's address and the Coley Telephone was identified as Coley's telephone number. The June 1, 1995 affidavit of Agent McNally, which was submitted to Judge Stanton in support of the wiretap authorization (the "June Affidavit"), set forth in detail information regarding King's dealings with the undercover agent and the confidential informant, as well as a description of other meetings and conversations between King and the agent or the informant over the Coley Telephone. The June Affidavit also contained a description of the conversations intercepted over the Piggott Wire and information obtained from a pen register on the Coley Telephone during the period February 22, 1995 to May 25, 1995. Specifically, the pen register showed

---

2. It was later determined that "Ro" or "RoRo" was not the same individual "Root," which was the name used by defendant King. In fact, at the time of the interceptions referring to "Ro" or "RoRo" over the Piggot Wire, King was actually incarcerated in North Carolina. *See* discussion *infra* at 88–89.

3. The Coley Telephone is also referred to as the "Lott Avenue Telephone" in various papers submitted in connection with this motion and the application for the August 1995 wiretap on King's telephone.

forty-seven calls to King's pager number, and 102 calls to the telephone number at the address listed by King as his residence on his driver's license. In addition, the affidavit set forth an analysis of the remaining 2,169 calls registered during that time, which included calls to several individuals arrested or wanted for robbery or narcotics trafficking.

On June 30, 1995, the government sought and obtained an extension of the authorization to intercept calls over the Coley Telephone, including the conversations of Coley, Coley's mother, Catherine Coley, Jackson, and Ward, who had been identified during the wiretap investigation.

Thereafter, on August 1, 1995, the government sought and obtained authorization[4] to intercept calls over telephone number (718) 629–4120, which was King's phone (the "King Telephone"). In the August 1, 1995 affidavit of Agent McNally, submitted in support of the wiretap on the King Phone (the "August Affidavit"), Agent McNally summarized much of the information set forth in his two earlier affidavits in support of the Coley phone wiretap and attached them as exhibits to the application for authorization to intercept calls over the King Telephone. The August Affidavit explains that in May 1995, the informant, who had received King's phone number from King's girlfriend, attempted to contact King over the King Telephone, only to be told by King not to call him there. Nevertheless, based on calls subsequently intercepted over the Coley Telephone, it was determined that King was in fact using the King Telephone for narcotics activities. The August Affidavit then set forth specific examples of calls intercepted over the Coley Telephone from King's Telephone beginning on June 2, 1995 through July 19, 1995. In setting forth these summaries of calls, Agent McNally noted that based on his experience and expertise, the individuals were using what he believed to be various coded references to narcotics, including "things," "ones," "shit," "stuff," "something," "it," "gloves," "brother," "mixture," and "bags." A review of the calls also indicated references to other unidentified individuals, including "Bald Head," later identified as Kenny Clark, "Bo," "Hermena," "Crystal LNU," "Fifi LNU," "Hollywood," "Lulu LNU," later identified as Althea Pierce, "Mary LNU," "Diane LNU," "Darnell LNU," and "Monkey LNU," among others. Based on the description of the intercepted conversations, many of these individuals appeared to be associated with the narcotics conspiracy.

The August Affidavit further explained that a pen register had been installed on the King Telephone beginning on July 6, 1995. During a period of less than two weeks— July 6 through July 18, 1995— the pen register showed a total of 434 calls over the King Telephone, averaging approximately thirty-three calls a day, of which approximately forty-three went to pagers. Six calls were placed to a phone number subscribed to by Gertrude Alexander, which King had called on several occasions over the Coley Telephone when narcotics-related conversations had occurred. The analysis of the toll records further showed calls to an individual previously convicted of the criminal possession and sale of marijuana.

On February 6, 1996, the government obtained an indictment in the Southern District of New York, charging the defendants, including King, Jackson, and Coley, with conspiracy to distribute and possess with intent to distribute in excess of fifty grams of crack cocaine between March 1994 and January 24, 1996. King, who was in state custody at the time, was brought to the district on February 15, 1996.

On September 16, 1996, the government obtained a nine count indictment in the Eastern District of New York, charging King, Jackson, Rice, Jakes, and Coley with conspiracy to distribute cocaine base between November 1994 and January 24, 1996. On October 7, 1996, an order of *nolle prosequi* was entered in the Southern District of New York with respect to defendants King, Jack-

**4.** The June 1, 1995 and June 30, 1995 wiretap orders were issued by Judge Stanton; the August 1, 1995 order was issued by the Honorable Barrington Parker, United States District Judge for the Southern District of New York.

son, Rice, Jakes, and Coley in that district.[5] Jakes and Rice subsequently pleaded guilty in this district but charges remain pending against King, Coley, and Jackson.

Defendant King moves to suppress the fruits of the wiretaps on both the Coley Telephone and the King Telephone, claiming: 1) that the government failed to comply with the requirements of Title III regarding the use of alternative investigative means; 2) that the affidavits submitted with the wiretap application contained allegedly material misstatements and omissions; and 3) that the government failed to adequately minimize the conversations intercepted over the King phone.

Defendant Coley moves to suppress the wiretap evidence on the same theories raised by King, and to suppress certain post-arrest statements on the grounds that her *Miranda* waiver was not knowing and voluntary. She also seeks an order directing the government to provide evidence pursuant to Rule 404(b) of the Federal Rules of Evidence.

Defendant Jackson adopts the positions of Coley with respect to the suppression of the wiretap evidence, and also seeks suppression of certain physical evidence, arguing that it is the fruits of an alleged improper wiretap. Finally, Jackson seeks production of certain discovery materials.

### DISCUSSION

#### Alternative Means

■ Defendants argue that the wiretaps should be suppressed because the initial Title III application failed to provide the requisite "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This requirement is a critical one, designed to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the

crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); *see also United States v. Robinson,* 698 F.2d 448, 452–53 (D.C.Cir.1983); *United States v. Williams,* 580 F.2d 578, 587 (D.C.Cir.), *cert. denied,* 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978). In requiring the government to show necessity in order to overcome the presumption in the statute against wiretapping, the courts have examined wiretap applications to determine whether the government has "allege[d] specific circumstances that render normal investigative techniques particularly ineffective." *United States v. Ippolito,* 774 F.2d 1482, 1486 (9th Cir.1985). General allegations as to why a specific class of cases is difficult to investigate are not sufficient: "[t]he affidavit must show with specificity why in this particular investigation ordinary means of investigation will fail," *Id.* (citing *United States v. Robinson,* 698 F.2d at 453).

■ On the other hand, the cases make it clear that the government "need not exhaust all conceivable alternative procedures before resorting to a wiretap." *United States v. Ippolito,* 774 F.2d at 1485. Rather, the government must show that " 'normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time.' " *Id.* (quoting *United States v. Spagnuolo,* 549 F.2d 705, 710 (9th Cir.1977)). Among the techniques considered by Congress are " 'standard visual or aural surveillance [by law enforcement officers,] general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.' " *United States v. Lilla,* 699 F.2d 99, 103 n. 5 (quoting S.Rep. No. 1097, 90th Cong., 2d Sess. 101, *reprinted in* 1968 U.S.Code Cong. & Ad. News 2112, 2190).

■ Defendants contend that the McNally affidavits were insufficient in several respects. First, defendants complain that the

---

5. The remaining defendants indicted in the Southern District case, including Althea Pierce, a/k/a "LuLu," Michael Ward, a/k/a "Ike," and Catherine Coley, a/k/a "T.T.," a/k/a "Tee," ultimately entered pleas to various charges in the

Southern District of New York. Defendant Dowtin was convicted after trial on two counts and defendant Kenny Clark, a/k/a "Baldhead," is currently incapacitated and in a health-care facility.

affidavits "merely recant[] ritualistic recitations of the unfeasibility of alternative investigative techniques." (King Mem. at 13). Second, they complain that the alternative means sections of McNally's affidavits failed to mention all of the instances where traditional techniques had been successful. They argue that the successful completion of several narcotics transactions between "members of the highest echelon of the alleged conspiracy" (*id.* at 17), and the informant or the undercover agent belies Agent McNally's assertion that the government had been unable to infiltrate the conspiracy at the highest level. In fact, the government was successfully utilizing the informant and agent to meet "with the very principals sought to be intercepted." (*Id.* at 13). Defendants also argue that the Second Circuit has previously rejected the rationale provided by the government as to why physical surveillance was not a viable alternative means, and note the numerous instances detailed in the McNally affidavits where successful surveillances had been conducted of meetings involving a target subject and the informant or the undercover agent. Defendants complain that nevertheless, none of these surveillances are set forth in the alternative means section.

Finally, and related to their second argument, defendants argue that information sufficient to indict the defendants was obtainable through traditional, non-wiretap methods, which the government had already pursued successfully. Defendants contend that with respect to the use of pen registers, the affidavits demonstrate that rather than being of limited value, the pen register had provided useful information regarding the phone activity. They also contend that the government ignored the numerous consensual recordings involving the informant and the undercover agent and did not mention their successful use in the alternative means section of the affidavit. Thus, defendants argue that several alternative investigatory techniques were available here, but the government chose the "shortcut" of wiretapping. (*Id.* at 24). Given the government's alleged "perfunctory" treatment of the most commonly used investigatory procedures (*id.*), defendants argue that suppression of the fruits of the wiretaps is warranted.

### 1) *The Affidavits' Specificity*

This Court does not agree with defendants' arguments. Turning first to defendants' claim that the alternative means section "merely recant[ed] ritualistic recitations of the unfeasibility of alternative investigative means," a review of the alternative means section of each of Agent McNally's affidavits demonstrates that the government in this case provided more than just a generalized statement as to why ordinary investigative techniques would fail. In the alternative means section of each affidavit, Agent McNally recited in some detail why each of the alternative techniques would fail, and while many of the arguments made first in the June Affidavit are repeated in the August Affidavit, the August Affidavit also provided additional information gleaned from the Coley intercepts as well as provided reasons unique to the King Telephone.

#### a. *Physical Surveillance*

With respect to physical surveillance, the June Affidavit acknowledged that physical surveillance had been conducted and generally "is useful mainly in placing two individuals together," but that surveillance itself "provides limited direct evidence of the significance of the meeting." (June Aff. ¶ 22(a)). The June Affidavit further set forth the fact that the wiretaps would not only assist the agents in establishing the roles of the various members of the conspiracy— something surveillance could not do— but would also provide information regarding the nature of their activities and the locations of physical evidence. Monitoring of the targets' telephone would also allow the agents to establish physical surveillance in advance of any meeting, thus reducing the likelihood of detection which could, in this case, endanger the life of the informant or result in a temporary stop or a change in the methods of the targets' activities.

The June Affidavit further explained that electronic surveillance would provide evidence of the dealings between the target subjects and other conspirators as well. With respect to problems with physical surveillance, the August Affidavit detailed the

fact that over the Coley phone, the government had learned that King's organization employed people on the roof with walkie talkies and children on bicycles to act as lookouts for law enforcement in the vicinity of Coley's residence. The August Affidavit also indicated that due to the location of King's residence in a single-family home on a narrow residential street, extended physical surveillance was difficult and might alert the subjects to the investigation.

### b. *Pen Registers and Phone Records*

The June Affidavit clearly indicated that telephone records and pen registers had been utilized in the investigation. Indeed, a pen register was installed and was monitoring calls over the Coley Telephone for approximately three months prior to the initial wiretap application. Despite this use of the pen register and corresponding subscriber information, the government explained that this information was of limited value because it did not provide either the identity of the speakers involved in the conversations or the nature of their conversations, thus necessitating the wiretap.[6] However, the information the government had received from the pen register—specifically, the sheer volume of calls on a daily basis, the fact that there were 212 calls to pagers and over ten calls to individuals other than the target subjects who had been identified as having some association with criminal activity—all supported the government's belief that the phone was being used in furtherance of the targets' illegal activities.

### c. *Grand Jury Testimony and Search Warrants*

The June Affidavit also explained in depth the impracticalities of calling potential witnesses to testify before the grand jury. As the affidavit explained, the people who could provide the information still sought by the government—specifically, "the activities, the sources of supply, and the identities of conspiracy members"—were the people who the

government had already identified as members of the conspiracy. (June Aff. ¶ 22(c)). Obviously, it was unlikely that any of these identified co-conspirators, who faced criminal charges for their roles in the conspiracy, would testify voluntarily and, if the government were to grant them immunity, it would be contrary to public policy not to hold them accountable for their crimes. Moreover, because the government believed at that time that "this appears to be a broad organization" (*id.*), there was concern that if questioned, the known members of the organization would alert other members of the conspiracy, or would risk contempt rather than testify.

Similarly, the June Affidavit explained that search warrants would be ineffective and premature at that point in the investigation because the full scope of the conspiracy was still unknown and searches would inevitably alert the targets to the existence of the investigation.

### d. *The Undercover Investigation*

Finally, the June Affidavit explained in some detail why the informant and the undercover agent would be unable to expose the full extent of the conspiracy. While the June Affidavit acknowledged that the informant had provided substantial information, he had not been "able to infiltrate this group at the highest level" (*id.* at ¶ 22(d)), nor had he been permitted to enter Coley's apartment where the target telephone was located. According to the June Affidavit, not only did the informant have limited information about the drug activities of the targets, but he could not "provide evidence of sources of supply," the identities of other members, or the storage locations for the narcotics. (*Id.*). Thus, while the June Affidavit specified that the undercover agent had been able to glean a limited amount of information about the organization, it made it clear that among the areas in which the undercover agent had been unsuccessful were in learning the

---

6. As noted by the court in *United States v. Shipp*, it is clearly "recognized that the 'use of pen registers, which do not identify the participants to a telephone conversation, ... would be unlikely to uncover [one's] partners in crime.'" 578 F.Supp. 980, 985 (S.D.N.Y.1984) (quoting *United States v. Martino*, 664 F.2d 860, 868 (2d Cir. 1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982)).

sources of supply and storage locations for either the drugs or weapons. In addition, Agent McNally explained in some detail why, based on his experience, it would not have been safe for either the informant or the agent to attempt to probe King more deeply about his organization's activities and other individuals with whom King conducted business. Specifically, he explained his belief that "drug traffickers are not likely to discuss the full extent of their organization's activities or membership when dealing with 'outsiders' such as the CI and the UC." [7] (*Id.*). If either the informant or the agent were to push for this information, "such conduct would draw suspicion to the CI and the UC and might alert the subjects to the nature of the investigation." (*Id.*). Thus, the June Affidavit concluded by stating that because it appears unrealistic that the informant or the agent would be able to obtain sufficient information to identify all of the members of the organization and their respective roles in the conspiracy, the government would be unable to meet the objectives of its investigation in the absence of a wiretap.

With respect to the use of the informant and the undercover agent, the August Affidavit indicated that the informant had been unable to infiltrate the organization at a higher level and that King did not want the informant calling him at home. Similarly, the undercover agent also had only a "limited picture" of the organization, and was unable to learn King's sources of supply for either weapons or narcotics. (August Aff. ¶ 35(f)).

### e. The Coley Wire

The August Affidavit explained why authorization to intercept calls over Coley's Telephone, while productive, had still not enabled the government to identify many of the other individuals involved in the conspiracy or the locations out of which they operated. Indeed, it is apparent from conversations summarized in the August Affidavit, that King's narcotics business exceeded the business conducted over the Coley Telephone, and that

Coley was only one of King's distributors. Moreover, during one conversation intercepted over the Coley Telephone, King told an individual named "Tee" that he would be able to get her something because "his people [his suppliers] are coming back through." (August Aff. at ¶ 36(b)).

With respect to law enforcement surveillance over the telephone, the August Affidavit noted that King had warned Coley over an intercepted call that she should be careful about what she says on the telephone, not to mention names, not to count "them" over the phone, and not to talk about certain subjects. The government also learned that King not only used beepers, cellular phones, and pay phones to avoid detection by law enforcement, but also had a privacy device on a cellular phone that blocked access to identification by a pen register.

While defendants argue that the alternative means sections in the affidavits are conclusory, this Court finds on the contrary that they are "remarkably detailed." *See United States v. Robinson*, 698 F.2d at 453. The affidavits provide exhaustive detail of the evidence available through the traditional means of investigation and state the reasons why each specific technique was not satisfactory in this case or was risky in that it might compromise the security of the undercover agent or informant or jeopardize the investigation itself. *See United States v. Ruggiero*, 726 F.2d 913, 924 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984). Indeed, this Court notes that the case of *United States v. Lilla*, 699 F.2d 99, relied on by defendants in support of their contention, is factually distinguishable from this case. According to the court's description of the affidavit submitted in *Lilla*, there were two short paragraphs in which the applying officer made the following conclusory statements:

"I am able to conclude that this investigation ... involves other unknown co-conspirators and that no other investigative method exists to determine the identity of these other persons involved and of obtain-

---

7. In the affidavits, the term "CI" refers to the confidential informant and the term "UC" refers to the undercover agent.

ing legally sufficient evidence of their guilt except by wiretapping .... Although probable cause exists from the facts set forth above to support the issuance of Arrest and/or Search Warrants, .... I am able to conclude that an operation such as set forth above, must involve others and that an arrest and or search at this time would not stop the whole conspiracy operation, but only move it to continue elsewhere, requiring new leads and information, which might not be so readily available and no other investigative procedures exist to determine the identity of other persons participating and conspiring and of obtaining legally sufficient evidence of the guilt, except by wiretapping."

*Id.* at 101. This two paragraph description is distinctly less detailed and specific than the investigative means section of the McNally affidavits. Unlike the warrant application in *Lilla*, the government's applications here not only explained the potential problems with other techniques, but also made it clear that the government had explored each alternative prior to seeking authorization for the wiretap applications. Indeed, the cases clearly hold that the government's "good faith effort need not have exhausted all possible uses of ordinary techniques;" rather, the government must show that in the investigation, "normal investigative techniques employing a normal amount of resources have failed to make the case within the reasonable period of time." *United States v. Spagnuolo,* 549 F.2d at 709.

### 2) "Omissions" from the Alternative Means Section

■ With respect to their second argument, defendants have cited no authority which even begins to suggest that the government's failure to include in the alternative means section itself descriptions of each of the dates of successful surveillances, results of the pen registers, and consensual recordings, constitutes a failure to comply with 18 U.S.C. § 2518(1)(c). Indeed, the Second Circuit has on numerous occasions advised courts to look at the totality of the affidavit, and view this type of affidavit " 'in a commonsense and realistic fashion.' " *United States v. Ivic,* 700 F.2d 51, 57 (2d Cir.1983)

(citation omitted); *see also United States v. Ruggiero,* 726 F.2d at 924; *United States v. Steinberg,* 525 F.2d 1126, 1131 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). Moreover, "deference [is to be] properly accorded to the issuing judge." *United States v. Todisco,* 667 F.2d 255, 258 (2d Cir.1981), *cert. denied,* 455 U.S. 906, 102 S.Ct. 1250, 1251, 71 L.Ed.2d 444 (1982); *United States v. Perry,* 643 F.2d 38, 50 (2d Cir.1981), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981) (according deference to the magistrate judge with respect to the probable cause determination). Where, as here, the government has examined in detail the successful use of traditional investigative techniques in the probable cause section of the wiretap application, there is no need to reiterate that information in the alternative means section.

### 3) Failure to Pursue Successful Traditional Techniques

■ At oral argument, counsel for defendants elaborated on their memoranda and elucidated for the court their argument that aside from the government not stating instances of successful traditional techniques in their alternative means section, "everything [the government] needed [was] readily obtainable through the means they [were] using short of the wiretap." (Transcript of Hearing dated Aug. 12, 1997, at 37). According to the defendants, these already successful techniques include surveillance, use of the pen register, the infiltration of the informant and the undercover agent, and the consensual recordings and purchases between the undercover agent or the informant and the defendants.

Defendants' arguments regarding the failure of the application to reveal the success and true potential of traditional techniques such as physical surveillance and further infiltration by the agent and informant are similar to the arguments raised and rejected by the court in *United States v. Sanchez–Flores,* No. 94 CR 864, 1995 WL 765562 (S.D.N.Y. Dec. 29, 1995). In that case, as here, "the defendants make the false assumption that [King and his co-conspirators] would have told the CI [or the undercover

agent] anything [they] wanted to learn." *Id.* at *4. It is clear from the McNally affidavits, that both the informant and the agent here were mere customers of the King organization, and while they had been successful in meeting with King and actually making purchases from him, none of this suggests "a willingness to disclose the identity of the sources nor did [they] identify anybody." *Id.* As the court in *Sanchez–Flores* noted, "there is no requirement given the CI's limited success in obtaining information that the Government must rely exclusively on information and evidence that the informant generated." *Id.* at *5.[8]

Agent McNally in the August Affidavit, set forth a detailed analysis of King's use of clandestine methods to avoid surveillance. Despite these showings, defendants argue that the government should have been required to further exhaust these investigative techniques before wiretapping was authorized. As the court in *United States v. Shipp,* noted:

> Their Monday morning quarterbacking as to what investigative techniques the agents should have employed in addition to what they did employ is utterly unrealistic, if not naive. 'An affidavit describing the standard techniques that have been tried and facts demonstrating why they are no longer effective is sufficient to support an eavesdropping order even if every other possible means of investigation has not been exhausted.' ... Agents are not required to resort to measures that will be clearly unproductive. A reasoned explanation, grounded in the facts of the case, and which 'square[s] with common sense,' is all that is required.

578 F.Supp. at 989 (S.D.N.Y.1984) (citations omitted).

Finally, defendant King argues that the undercover investigation providing evidence of direct purchases of guns and narcotics was so successful that no wiretap was necessary here in order to obtain a conviction of the top members of the organization. A similar argument was made and rejected by the Second Circuit in *United States v. Hinton,* 543 F.2d 1002, 1011 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). There a "rather extensive investigation" against the lead defendant Matthews and his co-conspirators had been underway for some time, but the normal investigative techniques had become increasingly unsuccessful in obtaining evidence against known co-conspirators and information about Matthew's "expansive narcotics operation." In upholding the propriety of the wiretap authorization, the Second Circuit stated:

> Thus, even though state or federal officers may have garnered sufficient information without the use of wiretaps to support an indictment against Matthews, and possibly against a few others, there was every reason to believe that additional co-conspirators were involved who could not be successfully investigated without wiretapping.

*Id.* at 1011.

Defendants would have this Court ignore the fact that the investigation into King and the other members of his organization had been ongoing for over five months when the first application was made. Despite that investigation which had been successful in identifying certain members of the conspiracy, including two potentially key participants, Coley and King, and had produced direct sales of drugs and offers to sell guns from King, the wiretap affidavit makes it clear that the government, after months of trying, had been unsuccessful in identifying King's sources or all of the other members of the organization who were involved in a conspiracy with King. Neither traditional surveillance, pen registers, nor even the infiltration of the organization by the undercover agent and the informant had produced the identity or location of King's sources of supply.[9]

---

8. Similarly, efforts to obtain consensually record conversations alone will not generally uncover the full scope of a conspiracy where the members of the conspiracy are "not about to discuss all their sources of supply, their customers, and the manner in which they stored and distributed narcotics." *United States v. Sanchez–Flores,* 1995 WL 765562, at *4.

9. Unlike the affidavit in *United States v. Simpson,* 813 F.2d 1462, 1471–72 (9th Cir.1987), *cert. denied,* 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987), a case cited by defendants in support

Agent McNally's affidavits clearly indicated the fact that despite an extensive undercover investigation, there was no realistic prospect of infiltrating the organization beyond King's level.

Viewing the affidavits in a "practical and common sense manner," *United States v. Torres*, 901 F.2d 205, 231 (2d Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990), and giving due deference to the issuing judge's determination here, this Court finds that the government made a good faith effort to employ normal investigative techniques, some of which we're admittedly successful. However, after a reasonable period of time, it became clear that traditional methods were no longer producing the information that was sought regarding sources, stash locations, and other members of the conspiracy, and that a wiretap was then justified. This Court also finds that despite the government's decision not to repeat in the alternative means section all of the information previously set forth in the probable cause section of the warrant application, nevertheless, the affidavit, as a whole, was sufficiently detailed to satisfy the requirements of 18 U.S.C. § 2518(1)(c) and the affidavit was not "particularly misleading." *See United States v. Simpson*, 813 F.2d at 1471. Accordingly, this Court respectfully recommends that defendants' motion to suppress, based on the alleged insufficiency of the alternative means section, be denied.

### *Franks Hearing*

Defendants also argue that the intercepted conversations should be suppressed because the government here obtained the wiretap authorization through material misrepresentations and omissions regarding the availability of other investigative means. In evaluating such claims, the Second Circuit has utilized the analysis employed in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *See also United States v. Bianco*, 998 F.2d 1112, 1125 (2d Cir.1993), *cert. denied*, 511 U.S. 1069, 114 S.Ct. 1644, 128 L.Ed.2d 364 (1994); *United States v.*

*Ferguson*, 758 F.2d 843, 848 (2d Cir.), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985). In *Franks*, the Supreme Court held that when examining allegations of falsehood in a search warrant application, the reviewing court should set aside the false assertion and consider whether the information remaining in the warrant is sufficient to establish probable cause. If not, the warrant must be vacated and the evidence gathered pursuant to the warrant suppressed.

It is clear that *Franks* requires a hearing to test a search warrant's veracity only where the defendant preliminarily makes a substantial showing that a materially false statement in the warrant affidavit was made knowingly and intentionally or with reckless disregard for the truth. *See Franks v. Delaware*, 438 U.S. at 155–56; *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C.Cir.1989) (holding that defendant must make "an adequately supported" showing that statements in an affidavit are deliberately false or made with reckless disregard for the truth in order to obtain a *Franks* hearing), *cert. denied*, 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990). It is equally clear that the affidavit "must be read as a whole and in a 'sensible pragmatic' manner." *United States v. Sobamowo*, 892 F.2d at 93 (quoting *United States v. Richardson*, 861 F.2d 291, 293–94 (D.C.Cir.1988), *cert. denied*, 489 U.S. 1058, 109 S.Ct. 1325, 103 L.Ed.2d 593 (1989)). "No hearing is required 'merely because the defendants disagree with the government's assessment of the need for a wiretap and with the judge's determination that an order is appropriate.' " *United States v. Sanchez–Flores*, 1995 WL 765562, at *5 (quoting *United States v. Crozzoli*, 698 F.Supp. 430, 435 (E.D.N.Y.1988)).

Here the material omissions alleged by defendants are: 1) the failure of the government to include instances of successful surveillance in the alternative means section; 2) the omission of consensually recorded conversations from the alternative means section; and 3) the failure to include descriptions of the successful undercover purchases

---

of their claim, here there was no material misrepresentation or omission as to the role of either the informant or the agent; rather, the McNally affidavits reported the extent of the involvement of the undercover agent and informant.

in the alternative means section. The material misrepresentations alleged include: 1) the government's statement that the King Telephone will be used to further narcotics transactions, even though the undercover had been told by King not to use this phone for narcotics-related calls; 2) the implication in the June Affidavit, derived from the Piggot investigation, that King and Sha had been working together; and 3) the statements in both the Coley and King affidavits that the informant and undercover agent had limited access to the locations where guns and drugs were stored, even though King had offered to take the agent into the apartment at 282 Hegeman to weigh drugs.

■ Turning first to the alleged omissions, again, the gravamen of defendants' complaint appears to be that even though the government set forth numerous instances of physical surveillance and consensually recorded calls, as well as detailed descriptions of purchases by the agent in the probable cause section of the warrant, the government's failure to include these statements again in the "alternative means" section should be considered a material omission. As noted above, it is beyond cavil that a warrant application must be viewed in its entirety. *See United States v. Sobamowo*, 892 F.2d at 94. Here, while there may be a few examples of conversations that are not set forth in the affidavits,[10] the substance of these omitted conversations appears to be insignificant. There is no question, however, that the majority of the information cited by defendants is contained in the affidavits. Both Judge Stanton and Judge Parker were well informed of the type of information being obtained by both the undercover agent and the informant and none of the omitted conversations would have resulted in a different decision regarding the proprietary of a wiretap. Similarly, King's warning to the confidential informant not to use the phone is clearly set forth in paragraphs 10 and 36(f) of the August affidavit. Even if this statement had been absent altogether from the affidavit, the information in the application demonstrating King's use of

the King Telephone for narcotics related conversations, albeit with others, provided sufficient probable cause for the application. As the court in *Sanchez–Flores* noted: "the suggestion that by not referring to some conversations in his affidavit, [the agent's] omissions trigger a *Franks* hearing is rejected." 1995 WL 765562, at *5. More important, however, defendants have failed to cite, and this Court has failed to find any authority which requires each and every successful use of an investigative technique to be repeated both in the probable cause section and again in the alternative means section of the warrant. Thus, this argument is without merit.

■ Moreover, while there does not appear to be any mention in the McNally affidavits of King's offer to take the undercover agent into the 282 Hegeman address, this fact does not render the statement regarding the government's access to storage places false or misleading. The fact that King might have been willing to take the undercover into this particular address does not mean that he either stored his contraband there or that he would be willing to take the agent to any other locations. Thus, this Court finds this omission to be neither material nor misleading.

■ With regard to the final concern raised by the defendants—namely, the government's confusion of King, a/k/a "Root," with the individual who used the alias "Ro" or "Ro Ro"—this issue does not rise to the level of showing deliberate or intentional misrepresentation or reckless disregard for the truth. As set forth in Agent McNally's May Affidavit submitted in opposition to defendant's motion to suppress, the government did not learn the truth about "Ro's" identity and King's incarceration until after King was arrested and arraigned on the Southern District of New York indictment. Specifically, Agent McNally explains that it was not until approximately February 28, 1996, long after the wiretap affidavits were submitted to the court, that he learned that "Ro" or "Ro Ro" was not the same individual as King. He states that at the time of Dowtin's arrest on

---

10. Indeed, a number of these alleged omitted conversations involve instances where the caller is looking for King and is told he is not available.

*See* the four conversations, two on each of February 15, 1995 and March 10, 1995.

that date, a confidential source identified Dowtin in the vicinity of Nostrand Avenue in Brooklyn. The source also identified the individual standing next to Dowtin as "Ro." "Ro" was later arrested by state authorities and determined to be Ronald Seabrooks. According to the May Affidavit, it wasn't until after King had been arrested and the government was involved in plea discussions that Agent McNally, in reviewing King's criminal history record, determined that he had been incarcerated in North Carolina in April 1994 when the conversation about "Ro" or "Ro Ro" occurred between Piggott and Hampton.

While defendants have not challenged the veracity of Agent McNally's statement as to when he discovered the error, they in substance argue that the agent was negligent in not making this determination earlier. It is well-established that statements alleged to be intentionally false must be known to be false at the time they were made. Here, it is clear that defendants have failed to make the requisite showing that there were either intentional misrepresentations or omissions from the affidavits or that even if there were, that the statements were so material so as to cause the issuing judge to deny the application. Since defendants have failed to make even the "substantial preliminary showing" of intentional or even reckless falsehood, *Franks v. Delaware*, 438 U.S. at 155, this Court respectfully recommends that defendants' motion for a *Franks* hearing be denied.

### Minimization

▮▮▮▮ Defendants' final argument in their efforts to suppress the Coley and King wiretaps [11] is the claim that the government

failed to comply with the provision of Title III that monitoring of intercepted conversations "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). This requirement is intended to confine the government's intrusions into the privacy and personal lives of the targets and anyone who may innocently come into contact with the targets. *See United States v. Hoffman*, 832 F.2d 1299, 1307 (1st Cir.1987).

In *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), the Supreme Court analyzed the issue of compliance with the minimization requirements by examining the reasonableness of the intercepting agents' conduct. *See also United States v. Hoffman*, 832 F.2d at 1307. The Court recognized that "[b]ecause of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case" and held that "the issue of compliance will depend on the facts and circumstances of each case." *Scott v. United States*, 436 U.S. at 140–41. Indeed, in *Scott*, the agents monitored for an entire month without making any efforts to minimize and yet the Court nevertheless rejected defendants' assertion of non-compliance.

Courts in this circuit asked to determine whether agents have complied with the minimization requirement have "looked to whether the agents devised a reasonable means of limiting interception, and whether they utilized the safeguards in good faith." *United States v. Hinton*, 543 F.2d at 1012 (citing *United States v. Manfredi*, 488 F.2d 588, 599–600 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. Tortorello*, 480 F.2d 764,

---

11. It is clear that King and Coley each have standing to move to suppress the wiretap evidence obtained over the King and Coley Telephones, respectively, as "aggrieved person[s]" under 18 U.S.C. § 2518(10)(a) because they were parties to intercepted conversations over both of the phones and because conversations were intercepted at their respective premises. *See United States v. Simpson*, 813 F.2d 1462, 1470 n. 11 (9th Cir.1987), *cert. denied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987); *United States v. Fury*, 554 F.2d 522, 526 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095

(1977). However, King does not have standing to challenge the propriety of the agent's minimization of the calls intercepted over the Coley wire because the failure to minimize conversations over Coley's phone is an invasion of her privacy, not King's. *See United States v. Fury*, 554 F.2d at 526; *United States v. Poeta*, 455 F.2d 117, 122 (2d Cir.1972), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972). Similarly, Coley has no standing to challenge the minimization techniques used on the King phone.

783–85 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d ·86 (1973).) Several factors have been considered by the courts in determining whether electronic surveillance has been properly minimized. First, courts have permitted agents to intercept large numbers of calls when the conversations are ambiguous or involve coded language, are short in duration, or are "one-time only" calls. *Scott v. United States,* 436 U.S. at 140. Indeed, some courts have held that the interception of calls that are two· minutes or less is reasonable and the minimization requirement does not apply. *See United States v. Bynum,* 485 F.2d 490, 500 (2d Cir.1973), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); *see also United States v. Armocida,* 515 F.2d 29, 45 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); United States v. *Capra,* 501 F.2d 267, 275 (2d Cir.1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975).

▮ Moreover, the circumstances of the wiretap, including the nature of the conspiracy involved, the number of co-conspirators, and the type of normal usage of the telephone, are important in considering whether proper minimization techniques were used. *See Scott v. United States,* 436 U.S. at 140; *see also United States v. Nersesian,* 824 F.2d 1294, 1307 (2d Cir.1987) (relaxing minimization requirements in widespread narcotics conspiracy), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987); *United States v. Hoffman,* 832 F.2d 1299, 1308 (1st Cir.1987) (holding that where "an investigation is focused largely on blueprinting the shape of the conspiratorial wheel and identifying spokes radiating from its hub, the need

to allow latitude to eavesdroppers is close to its zenith").

Among other measures considered by courts in determining compliance with Section 2518(5) are whether the monitoring personnel are provided with minimization instructions, *United States v. Rizzo,* 491 F.2d 215, 217 (2d Cir.1974), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974); whether monitoring logs are maintained, *id.; see also United States v. Hinton,* 543 F.2d at 1011–12; whether the surveillance and the progress of the surveillance is being supervised by the prosecutor, *United States v. Rizzo,* 491 F.2d at 217; *see also United States v. Santoro,* 647 F.Supp. 153, 160–61 (E.D.N.Y.1986), *aff'd,* 880 F.2d 1319 (2d Cir. 1989); and whether there is supervision by the court through the provision of periodic ten-day reports. *See United States v. Santoro,* 647 F.Supp. at 161.

Here a review of the orders and instructions provided to the monitors contain detailed instructions regarding procedures to be followed not only in minimizing calls, but in maintaining logs, spot monitoring, identifying new conspirators, monitoring for other criminal offenses, monitoring for privileged communications, and sealing the tapes. Moreover, as demonstrated by a review of the ten-day reports, it is clear that there was both supervision of the wire by the prosecutor and the court. The ten-day reports submitted to the court not only contain summaries of certain· pertinent calls, but also detail the .total calls intercepted on a day-by-day basis, the number of calls actually completed, the number of ·calls over. two minutes in length, and the number of calls minimized.[12] Based on the reports, it appears that· out of 802 calls on the Coley Telephone, the vast

---

12. Those results are summarized as follows:

| 10–Day Reports—Coley Wire | Completed Calls | Two Min. Plus | Minimized |
| --- | --- | --- | --- |
| June 12, 1995 | 190 | 39 | 26 |
| June 22, 1995 | 137 | 36· | 23 |
| July 3, 1995 | 134 | 36 | 17 |
| July 11, 1995 | 94 | 24 | 11 |
| July 21, 1995 | 152 | 46 | 28 |
| Aug. 1, 1995 | 95 | 23 | 15 |
| | 802 | 204 | 120 |
| 10–Day Reports—King Wire | | | |
| Aug. 14, 1995 | 124 | 33 | 46 |
| Aug. 21, 1995 | 107 | 21 | 31 |
| | 231 | 54· | 77 |

majority—598 or approximately 75%—were less than two minutes in duration, thus falling outside the minimization requirement. *See United States v. Bynum*, 485 F.2d at 500. The ten-day reports indicate that approximately 15% of all completed calls were minimized. Similarly, with respect to the King Telephone, out of 231 completed calls, only 54 were longer than 2 minutes and 77 calls were minimized—approximately 33% of the total calls—thus indicating that the agents were minimizing not only the calls over 2 minutes but the shorter calls as well. As the Court in *Scott* stressed, "the percentage of nonpertinent calls [may be] relatively high and yet their interception [may] still [be] reasonable." *Scott v. United States*, 436 U.S. at 140, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); *United States v. Turner*, 528 F.2d 143, 157 (9th Cir.1975) (affirming district court's finding that the minimization requirement was complied with where 78% of the calls were not narcotics related), *cert. denied*, 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975); *United States v. Manfredi*, 488 F.2d at 600 n. 8 (in a case involving a wiretap under New York State law, holding that the minimization requirements were satisfied even though 80% of the calls were nonpertinent).

King also challenges the accuracy of the agents' logs and the line sheets. For example, he cites several calls where the line sheets indicate calls that are longer or shorter in duration than a review of the actual tape indicates, or where the line sheets indicate minimization where in fact there was no minimization.[13] A review of the description of some of the calls challenged by defendants

indicates, however, the difficulties of minimization in a case, where as here, not all of the conspirators have been identified.[14] Moreover, their pertinent conversations are often interspersed with personal nonpertinent information, making it difficult at times to know when minimization is required. It is also clear from a review of the summaries provided by counsel that, in fact, many of the calls were minimized; King simply quarrels with the way in which the calls were minimized, suggesting in some calls that more of the call should not have been recorded.[15]

■ While a review of the calls described by King certainly shows some isolated incidents of nonpertinent calls that in hindsight perhaps should have been minimized or should have been minimized more completely, defendants' arguments fail to recognize the fact that Title III does not forbid the interception of all nonpertinent conversations, but merely requires the agents to take reasonable steps to minimize unnecessary intrusions. *See Scott v. United States*, 436 U.S. at 141; *United States v. Ianniello*, 621 F.Supp. 1455, 1471 (S.D.N.Y.1985). Given the nature of the conspiracy and the fact that the individuals involved were often not identified or used coded language interspersed with personal conversations, this Court finds that the agents made a reasonable, good faith effort to minimize the interceptions of nonpertinent communications. Thus, it is respectfully recommended that defendants' motion to suppress the fruits of the wiretaps on the grounds of inadequate minimization be denied.[16]

13.  *See* calls No. 2 on Aug. 3, 1995; No. 3 on Aug. 4, 1995; No. 2 on Aug. 5, 1995; No. 28 on Aug. 7, 1995; No. 1 on Aug. 12, 1995; No. 6 on Aug. 14, 1995; No. 451 on June 7, 1995; No. 509 on June 9, 1995; No. 692 on June 13, 1995; No. 1221 on June 22, 1995. *See also* call No. 20 on Aug. 18, 1995, where the line sheet indicates a two minute call, but King complains that it was in fact two minutes and nine seconds and was not minimized.

14.  *See, e.g.*, Call Nos. 7 and 28 on Aug. 7, 1995, where Adele and an unknown female and later Sylvia engage in conversations about hair dressing and other items; Call No. 1 on August 12, 1995, involving an unknown male discussing a carnival; Call Nos. 107, 115, 119 on June 3, 1995, involving unidentified individuals which

were partially minimized; Call No. 310 on June 7, 1995 between an unidentified male and female regarding a baby and purchasing rice.

15.  *See, e.g.*, Call No. 344 on June 6, 1995; Call Nos. 402, 433 on June 7, 1995; Call Nos. 603, 674 on June 11, 1995; Call No. 952 on June 18, 1995; Call No. 1447 on June 25, 1995; Call No. 1674 on June 29, 1995.

16.  To the extent that there are certain calls that should have been minimized, the better approach would be to suppress those particular calls. *See United States v. Principie*, 531 F.2d 1132, 1139–41 (2d Cir.1976), *cert. denied*, 430 U.S. 905, 97 S.Ct. 1173, 1174, 51 L.Ed.2d 581 (1977); *United States v. Shakur*, 560 F.Supp. 318, 326 (S.D.N.Y.

*Coley's Post Arrest Statements*

In her initial motion papers, defendant Coley moves to suppress certain post-arrest statements which the government has indicated that it may seek to introduce at trial. These statements were allegedly made to FBI agents following her arrest on January 24, 1996. Defendant does not contend that she did not receive her *Miranda* warnings, but rather contends that due to her lack of sophistication, she did not understand her rights and therefore any waiver of these rights was not knowing and voluntary.

The government, in its papers, urges this Court to deny Coley's motion without an evidentiary hearing based on her failure to allege, with specificity, facts sufficient to raise an issue that, if proved, could lead to the suppression of evidence. *See United States v. Pena,* 961 F.2d 333, 339 (2d Cir. 1992) (noting that the allegations in the moving papers must be "definite, specific, detailed and non-conjectural") (citations and internal quotations omitted); *United States v. Warren,* 453 F.2d 738, 743 (2d Cir.), *cert. denied,* 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972). The government argues that since the defendant failed to present an affidavit of an individual with personal knowledge of the facts, *United States v. Gillette,* 383 F.2d 843, 848–49 (2d Cir.1967), and merely presented a brief lacking in specificity and case law support for her claim, this Court has the discretion to deny the motion without the need to hold an evidentiary hearing. *See United States v. Warren,* 453 F.2d at 743.

There is, however, no need for this Court to address the issue at this time because at the hearing held on August 12, 1997, counsel for defendant Coley requested this Court to issue an order providing for a psychiatric evaluation of the defendant to determine her competency and ability to understand her rights. The government consented, subject to an order allowing the government to conduct its own evaluation of defendant, and the court reserved decision on the issue. On September 10, 1997, Judge Gershon appoint-

ed Dr. Kathy F. Yates, a psychologist, to conduct an examination of Coley.

Accordingly, based on the consent of the parties, this Court has stayed its decision on this motion pending a further report from the parties.

*Jackson's Motion to Suppress Physical Evidence*

Defendant Alfred Jackson moves to suppress all physical evidence seized from 181 Hegeman Avenue on the grounds that the warrant for Jackson's arrest was based in large part on the information gathered from the wiretaps. Since this Court has recommended that the wiretap evidence not be suppressed and Jackson has raised no other grounds for suppressing the physical evidence seized during the search, this Court respectfully recommends that Jackson's motion be denied.

*Jackson's Discovery Motion*

■ Pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Jackson moves for an order requiring the government to produce all recorded statements, notes, or memorandum reflecting statements made by former co-defendant, Althea Pierce, with respect to the conspiracy, regardless of whether it pertains to Mr. Jackson or not. Jackson also requests that the government produce Ms. Pierce for an interview by defendants' agents.

In response, the government has submitted, as part of the May Affidavit, the substance of statements made by Pierce regarding Jackson. According to the May Affidavit, Ms. Pierce has stated that while she knows Jackson from 181 Hegeman Avenue, she is not aware that he was involved in drugs, and that when dealers stashed their drugs in his doorway, Jackson did not approve. She has also told the agents that Jackson would argue with King about keeping drugs and guns in the abandoned building next to Jackson's address.

1983), *aff'd sub. nom United States v. Ferguson,* 758 F.2d 843 (2d Cir.), *cert. denied,* 474 U.S. 841,

106 S.Ct. 124, 125, 88 L.Ed.2d 102 (1985).

Apart from these statements, the government states that it is unaware of any other *Brady* material regarding Jackson. To the extent that Jackson seeks all statements by Pierce for use for impeachment purposes, the government indicated at the hearing that it would disclose such information two weeks from the hearing. This Court agrees that that is sufficient under the law, *see United States v. Nixon*, 418 U.S. 683, 701–02, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and recommends that, absent a showing that the government has failed to comply with its obligations under *Brady*, *see, e.g., United States v. Schwimmer*, 649 F.Supp. 544, 549–50 (E.D.N.Y.1986), defendant Jackson's motion should be denied.

### *Rule 404(b) Evidence*

Pursuant to Rule 404(b) of the Federal Rules of Evidence, defendants Coley, Jackson, and King[17] move for an order requiring the government to give notice of its intention to offer evidence of any similar acts against the defendants. Rule 404(b) requires the government to "provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of the evidence [of the similar act] it intends to introduce at trial." Fed.R.Evid. 404(b).

At the August 12, 1997 hearing, counsel for the government acknowledged her responsibility under Rule 404(b) and represented to this Court that the government would comply with its obligations. In view of the government's indication of compliance, this Court sees no reason to enter an order at this time and, accordingly, respectfully recommends that defendants' request be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e), 72; *Small v. Secre-* *tary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).

**SO ORDERED.**

---

**17.** At the August 12, 1997 hearing, counsel for King indicated that King joins in this motion.